**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FILED
3/31/23 9:11 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

| | | |
|---|---|---|
| In re: | : | Case No. 20-22276-GLT |
| | : | Chapter 7 (Prior 13) |
| VINCENT P. KELLY, | : | |
| | : | Related to Dkt. Nos. 96, 107, 114, 139, 170, |
| *Debtor.* | : | 176, 178 |
| | : | |
| In re: | : | Case No. 19-21309-GLT |
| | : | Chapter 13 |
| VINCENT P. KELLY, | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| In re: | : | Case No. 17-25165-GLT |
| | : | Chapter 13 |
| VINCENT P. KELLY, | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| In re: | : | Case No. 16-24838-GLT |
| | : | Chapter 13 |
| VINCENT P. KELLY, | : | |
| | : | |
| *Debtor.* | : | |
| | : | |

Owen W. Katz, Esq.
James Warmbrodt, Esq.
Office of the Chapter 13 Trustee
Pittsburgh, PA
*Attorneys for Ronda Winnecour*

Amy J. Coco, Esq.
DiBella Weinheimer
Pittsburgh, PA
*Attorney for Lawrence Willis, Esq.*

Joseph S. Sisca, Esq.
John Schanne, Esq.
Kevin M. Cartwright, Esq.
Office of the United States Trustee
Pittsburgh, PA
*Attorneys for the United States Trustee*

## <u>MEMORANDUM OPINION</u>

Chapter 13 of the Bankruptcy Code[1] requires a debtor to, in good faith, propose, confirm, and perform a plan of reorganization that is (among other things) feasible.[2]  Although it may not be easy, it is not terribly complex.[3]  The plan is a form, and its length and financial contribution are often dictated rather mechanically by the outcome of the means, best-efforts, and best-interests tests.[4]  Liquidating claims can be an involved process, but most plans rise and fall with funding.  The debtor must have sufficient regular income,[5] or assets that can be promptly liquidated, to demonstrate the plan obligation can be plausibly satisfied on a timely basis.[6]  Failing that, chapter 13 is off the table.  There is no "wait and see" option when a debtor's sworn schedules betray a plan as empty promises or wishful thinking.  Nor may a debtor "rent" the automatic stay with de minimis "adequate protection payments" under an unconfirmable "placeholder plan."[7]  Put simply, a chapter 13 debtor must "put up or shut up."

* * *

Attorney Lawrence Willis, Esq. filed the last four of debtor Vincent P. Kelly's five chapter 13 cases in six years, all of which were dismissed without objection following a material payment default under his confirmed plan.  Objectively, each serial filing displayed a declining commitment towards the completion of a confirmed plan with the proposed funding increasingly

---

[1]     Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as thereafter amended, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2]     See generally 11 U.S.C. § 1325(a).

[3]     Note that the Code and Bankruptcy Rules indicate that a plan should be filed within 14 days of the petition, see Fed. R. Bankr. P. 3015(b), with a confirmation hearing to occur not later than 45 days after the meeting of creditors. See 11 U.S.C. § 1324(b).

[4]     See 11 U.S.C. §§ 1325(a)(4), (b)(1)-(4).

[5]     See 11 U.S.C. § 109(e).

[6]     See 11 U.S.C. § 1325(a)(6).

[7]     See 11 U.S.C. § 1322(a).

unfeasible if not outright farcical.  But a further review also revealed an abusive pattern of machinations that seemingly targeted blind spots in the chapter 13 conciliation process.  As a result of these manipulations, the Debtor was repeatedly able to achieve confirmation and remain in chapter 13 for long periods without any genuine effort towards completing a plan.  Following a Court-ordered investigation by the United States Trustee ("Trustee") of Attorney Willis' conduct in these four cases,[8] the Court commenced proceedings to determine whether he violated, *inter alia*, Bankruptcy Rule 9011 or was otherwise overcompensated for his services.  Although Attorney Willis, the Trustee, and the chapter 13 trustee negotiated a settlement of these issues,[9] the Court disapproved the stipulation as filed primarily because it lacked an admission of wrongdoing.[10]  Now, for the reasons below, the Court finds that Attorney Willis violated Bankruptcy Rule 9011 in several respects but will impose sanctions largely consistent with the parties' stipulation.

## I.    BACKGROUND

The salient facts are not in dispute.[11]  Most details come directly from the Court's own records.[12]  Attorney Willis declined the opportunity to present evidence or submit further

---

[8]    *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107.

[9]    See *Settlement Stipulation by and Between Attorney Willis, United States Trustee, and Chapter 13 Trustee*, Case No. 20-22276-GLT, Dkt. No. 170-1.

[10]    See *Order*, Case No. 20-22276-GLT, Dkt. No. 176.  In fairness, Attorney Willis has shown a degree of remorse and acknowledges that there were things he should have done better.  At the same time, he has been slow to appreciate the severity of these acts and omissions.  So much so that the Court is now concerned that Attorney Willis' perspective may be common among consumer practitioners in the district.

[11]    While the Trustee's investigation revealed some points of disagreement between Attorney Willis and the Debtor during their depositions, they are not germane to the Court's ruling.

[12]    The Court may take judicial notice of the docket events in the Debtor's cases as well as the contents of his schedules.  See U.S. Trustee v. Kubatka (In re Kubatka), 605 B.R. 339, 345 n.2 (Bankr. W.D. Pa. 2019); U.S. Trustee v. Stone Fox Capital LLC (In re Stone Fox Capital LLC), 572 B.R. 582, 592 n.3 (Bankr. W.D. Pa. 2017); see also Fed. R. Evid. 201(b).

3

briefing in his defense.[13]  Instead, he agreed that his written response ("Omnibus Response") and attached exhibits provide sufficient augmentation to the record to enable a fair assessment of his conduct.[14]

To understand the outwardly strategic pattern of abuse, as opposed to mere sloppiness, a review of the Debtor's bankruptcy filings is necessary.  The Court observes that Attorney Willis has practiced consumer bankruptcy law for over 20 years, having filed roughly 1,100 chapter 13 cases in that time.[15]  Although he was not involved with the Debtor's "first" chapter 13 filing in 2015 ("First Case"),[16] it established the facts known when he began his representation in the second chapter 13 case in 2016 ("Second Case").[17]  Indeed, the crux of the Bankruptcy Rule 9011 issue is that information must be carried from one case to the next.  For clarity, the Court will set the stage with a few background facts common to all the cases.

The Debtor owns three real estate parcels in Pittsburgh: 73 Cherry Street, 108 Cherry Street, and 110 Cherry Street.[18]  He lives in the first and rents the others.[19]  His daughter and her three children occupy 108 Cherry Street,[20] while a tenant (possibly his nephew) rents 110

---

[13]     *Status Report*, Case No. 20-22276-GLT, Dkt. No. 178 at ¶ 3.

[14]     See *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139.

[15]     *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶ 10.

[16]     See Case No. 15-20009-GLT.  Technically, the Debtor filed several bankruptcies approximately 12 years earlier that have no bearing on this case.

[17]     See Case No. 16-24838-GLT.

[18]     See *Schedule A—Real Property*, Case No. 15-20009-GLT, Dkt. No. 12 at 8; *Schedule A/B: Property*, Case No. 16-24838-GLT, Dkt No. 26 at 3-4; *Schedule A/B: Property*, Case No. 17-25165-GLT, Dkt No 22 at 3-4; *Schedule A/B: Property*, Case No. 19-21309-GLT, Dkt No. 1 at 11-12; *Schedule A/B: Property*, Case No. 20-22276-GLT, Dkt No 20 at 3-4.

[19]     Id.

[20]     *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 74-75.

Cherry Street.[21]  The combined rent generated by these properties has fluctuated between $928

and $1,200 a month,[22] which is allegedly below market.[23]  During these cases, the aggregate

scheduled value of the properties has ranged from $119,000 to $196,100.[24]  They are not

encumbered by mortgages but have been subject to substantial municipal liens—the impetus

behind the Debtor's serial filings.  Given the nature of his debt and his significant non-exempt

equity in the properties, each case required a plan that pays all claims in full.  Funding has been

the constant hang-up.  According to the Debtor's *Schedule(s) I*, he is disabled and his only sources

of income are social security, rental payments, and some "casual income."[25]

---

[21]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 27:19-28:15.  Even Attorney Willis is unsure whether the tenant residing in 110 Cherry Street has always been the same person throughout these cases.  *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 75, n.10.

[22]    See *Schedule I: Your Income*, Case No. 15-20009-GLT, Dkt. No. 12 at 21-22; *Schedule I: Your Income*, Case No. 16-24838-GLT, Dkt No. 26 at 25-26; *Schedule I: Your Income*, Case No. 17-25165-GLT, Dkt No. 22 at 25-26; *Schedule I: Your Income*, Case No. 19-21309-GLT, Dkt. No. 1 at 33-34; *Schedule I: Your Income*, Case No. 20-22276-GLT, Dkt No. 20 at 27-28.  The Debtor's daughter's rent was $500 throughout these cases, while the tenant's rent has fluctuated.  *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 30:22-31:9.

[23]    The Debtor and Attorney Willis agree that the Debtor always received less than market rate rent for these properties but are very far apart in their assessments of the market.  See *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶¶ 13-14 (describing a $650 difference of opinion for 108 Cherry Street and an $800 difference for 110 Cherry Street).  Beyond these opinions, there is no record from which the rental value could be ascertained.

[24]    See *Schedule A—Real Property*, Case No. 15-20009-GLT, Dkt. No. 12 at 8; *Schedule A/B: Property*, Case No. 16-24838-GLT, Dkt No. 26 at 3-4; *Schedule A/B: Property*, Case No. 17-25165-GLT, Dkt No. 22 at 3-4; *Schedule A/B: Property*, Case No. 19-21309-GLT, Dkt. No. 1 at 11-12; *Schedule A/B: Property*, Case No. 20-22276-GLT, Dkt No. 20 at 3-4.

[25]    See *Schedule I: Your Income*, Case No. 15-20009-GLT, Dkt. No. 12 at 21-22; *Schedule I: Your Income*, Case No. 16-24838-GLT, Dkt No. 26 at 25-26; *Schedule I: Your Income*, Case No. 17-25165-GLT, Dkt No. 22 at 25-26; *Schedule I: Your Income*, Case No. 19-21309-GLT, Dkt. No. 1 at 33-34; *Schedule I: Your Income*, Case No. 20-22276-GLT, Dkt No. 20 at 27-28.

A.     The First Case (2015)

The First Case was filed in January 2015.[26]  The Debtor scheduled debts totaling

$50,423.04, consisting almost entirely of real estate taxes and municipal charges.[27]  The proofs of

claim, however, reflected more than twice that amount at $113,192.06.[28]  The Debtor was forced

to amend his plan twice, ultimately increasing his monthly payment obligation to $1,881.06[29]—

an amount nearly $200 more than his combined monthly income before expenses ("gross monthly

income").[30]  Unsurprisingly, the Debtor defaulted and the First Case was dismissed in September

2016.[31]

B.     The Second Case (2016)

On December 31, 2016, less than four months after the dismissal of the First Case,

Attorney Willis filed the Second Case on behalf of the Debtor.[32]  It was filed on an emergency

basis to stop a sheriff's sale of the Debtor's properties.[33]  According to Attorney Willis, the goal

was to save his residence at 73 Cherry Street and the 108 Cherry Street property where his daughter

lived.[34]

---

[26]    See Case No. 15-20009-GLT.

[27]    See *Summary of Schedules*, Case No. 15-20009-GLT, Dkt. No. 12 at 6.

[28]    See *Claims Register*, Case No. 15-20009-GLT (consisting of secured claims of $96,363.84, priority claims of $1,078.35, and general unsecured claims of $15,749.87).

[29]    *Amended Chapter 13 Plan dated 8/4/15*, Case No. 15-20009-GLT, Dkt. No. 36.

[30]    See *Schedule I: Your Income*, Case No. 15-20009-GLT, Dkt. No. 12 at 21-22.

[31]    *Order*, Case No. 15-20009-GLT, Dkt. No. 56.

[32]    See Case No. 16-24838-GLT.

[33]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 9-10; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 24:21-25:2.

[34]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 11; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 27:16-28:15.

On the Debtor's schedules, he listed debt totaling $104,786.76, nearly all of which was secured.[35]  His gross monthly income increased to $2,722 and, after expenses, yielded monthly net income of $1,000.[36]  The Debtor's plan proposed monthly payments of $1,000 for 60 months from his earnings with the balance paid from the sale proceeds of 110 Cherry Street.[37]  At the meeting of creditors, the Debtor affirmed his intent to sell 110 Cherry Street.[38]

Despite the contemplation of a sale, the Debtor never moved to retain a real estate broker.  At his deposition, Attorney Willis blamed the Debtor, explaining he failed to select a broker as advised.[39]  Although Attorney Willis followed up with him several times, he could not recall whether the Debtor provided a reason for not obtaining a broker.[40]

The chapter 13 trustee deemed the plan contested by August 2017,[41] and, after a hearing, the Court ordered the Debtor to file a broker employment application by November 4, 2017.[42]  When he failed to do so, the Court entered an order to show cause threatening dismissal.[43]  The Debtor did not respond, but Attorney Willis appeared at the show cause hearing and admitted

---

[35]    See *Summary of Schedules*, Case No. 16-24838-GLT, Dkt. No. 26 at 1.  Notably, this figure was within $80 of the claims filed.  See *Claims Register*, Case No. 16-24838-GLT.

[36]    *Schedule I: Your Income*, Case No. 16-24838-GLT, Dkt. No. 26 at 25-26; *Schedule J: Your Expenses*, Case No. 16-24838-GLT, Dkt. No. 26 at 27-28.  Since the First Case, the Debtor increased his monthly rental income by $272 and added $750 in monthly "casual income." *Schedule I: Your Income*, Case No. 16-24838-GLT, Dkt. No. 26 at 26.

[37]    See *Chapter 13 Plan Dated February 5, 2017*, Case No. 16-24838-GLT, Dkt. No. 27.

[38]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 20.

[39]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 30:22-31:9.

[40]    Id. at 32:12-33:3; see *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 22.

[41]    See *Conciliation Conference Minutes Dated 8/3/2017*, Case No. 16-24838-GLT, Dkt. No. 40; *Conciliation Conference Minutes Dated 9/7/2017*, Case No. 16-24838-GLT, Dkt. No. 41.

[42]    See *Text Order*, Case No. 16-24838-GLT, Dkt. No. 43.

[43]    See *Order to Show Cause*, Case No. 16-24838-GLT, Dkt. No. 44.

that the Debtor lacked an excuse for his non-compliance.[44]   Therefore, the Court dismissed the

case on December 21, 2017.[45]

    In the year that the case had been pending, the Debtor made plan payments totaling

only $9,000.[46]   Of that amount, $2,500 was paid to Attorney Willis,[47] bringing his total

compensation to $4,000.[48]

    C.    The Third Case (2017)

    Eight days after the dismissal of the Second Case (December 29, 2017), Attorney

Willis filed another chapter 13 petition on behalf of the Debtor ("Third Case").[49]   The purpose of

the Third Case was the same as the Second Case: avoid a tax sale of the Debtor's properties.[50]

Nevertheless, the Court did not extend the automatic stay under section 362(c)(3)(B) after Attorney

Willis twice disregarded the procedures relating to the scheduling of expedited matters.[51]

    After a three-week extension, the Debtor filed a plan and schedules resembling

those in the Second Case.  His liabilities increased by about $5 to $104,791.71.[52]   The Debtor's

gross monthly income decreased to $2,542, resulting in monthly net income of $700.[53]   His plan

---

[44]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 33:4-17.

[45]    See *Order Dismissing Case Without Prejudice and Terminating Wage Attachment*, Case No. 16-24838-GLT, Dkt. No. 52.

[46]    See *Trustee's Report of Receipts and Disbursements*, Case No. 16-24838-GLT, Dkt. No. 57.

[47]    Id.

[48]    See *Disclosure of Compensation of Attorney for Debtor(s)*, Case No. 16-24838-GLT, Dkt. No. 26 at 45.

[49]    See Case No. 17-25165-GLT.

[50]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 38:5-16.

[51]    See Case No. 17-25165-GLT, Dkt. Nos. 5, 9, 10, 15.

[52]    See *Summary of Your Assets and Liabilities and Certain Statistical Information*, Case No. 17-25165-GLT, Dkt. No. 22 at 1; see also *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 37:15-25.

[53]    See *Schedule I: Your Income*, Case No. 17-25165-GLT, Dkt. No. 22 at 25-26; *Schedule J: Your Expenses*, Case No. 17-25165-GLT, Dkt. No. 22 at 27-28.

again proposed a combination of monthly payments (this time, $700 for 60 months) and a sale of

110 Cherry Street,[54] whose scheduled value had increased by $35,000 from the prior case.[55]

       Just like the Second Case, however, the Debtor never moved to employ a real estate

broker.  At the meeting of creditors held in January 2018, the Debtor informed the chapter 13

trustee that he "may end up" funding his plan with rental income from 110 Cherry Street since a

tenant allegedly was willing to pay $900 a month.[56]  The chapter 13 trustee continued the matter

for conciliation, warning that abandoning the sale would require a monthly payment increase from

$700 to $2,325.[57]

       By the conciliation conference, however, the proofs of claim on file totaled

$114,235.20—about $9,500 more than scheduled.[58]  Now seven months into the Third Case, the

Debtor again agreed to modify the plan to increase the monthly payment obligation to $2,656.[59]

This was nearly $2,000 more than the Debtor's monthly net income.[60]  At his deposition, Attorney

Willis conceded the payment obligation would have been "difficult" for the Debtor, but he "gave

him the benefit of the doubt."[61]   In any event, the Court accepted the chapter 13 trustee's

recommendation and entered an order confirming the Debtor's plan as modified in August 2018.[62]

---

[54]    See *Chapter 13 Plan Dated January 20, 2018*, Case No. 17-25165-GLT, Dkt. No. 23.

[55]    Compare *Schedule A/B: Property*, Case No. 16-24838-GLT, Dkt. No. 26 at 4 with *Schedule A/B: Property*, Case No. 17-25165-GLT, Dkt. No. 22 at 4.

[56]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 34.

[57]    See Id. at ¶¶ 35-36.

[58]    See *Claims Register*, Case No. 17-25165-GLT (consisting of secured claims of $87,316.23, priority claims of $1,355,46, and general unsecured claims of $25,563.51)

[59]    See *Conciliation Conference Minutes Dated 7/26/2018*, Case No. 17-25165-GLT, Dkt. No. 39.

[60]    *Schedule J: Your Expenses*, Case No. 17-25165-GLT, Dkt No. 22 at 27-28.

[61]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 41:23-42:9.

[62]    See *Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions*, Case No. 17-25165-GLT, Dkt. No. 38.

A little over four months later, the chapter 13 trustee filed a *Certificate of Default Requesting Dismissal of Case*, alleging that the plan was $11,180 in arrears.[63]  The Debtor did not respond, and the Third Case was dismissed on March 5, 2019.[64]  Attorney Willis asserts that he advised the Debtor over a dozen times that a sale would be the most feasible way for a plan to succeed, but the Debtor was unwilling to do so.[65]  In 14-months, the Debtor paid a total of $7,000—an amount that is less than even the original $700 monthly obligation.[66]  And again, $2,500 of those proceeds were disbursed to Attorney Willis to pay the balance of his $4,000 fee for the Third Case.[67]

D.   The Fourth Case (2019)

On March 30, 2019, 25 days after the dismissal of the Third Case, Attorney Willis filed yet another chapter 13 petition on behalf of the Debtor ("Fourth Case").[68]  In this case, the Debtor's schedules and plan were filed on the petition date, though the schedules are largely identical to those filed in the Third Case.[69]  As a result, the scheduled debt was less than the proofs of claim filed in the Third Case.[70]  Attorney Willis justified filing an identical *Schedule D* in each

---

[63]   See *Certificate of Default Requesting Dismissal of Case*, Case No. 17-25165-GLT, Dkt. No. 41.

[64]   See *Order Dismissing Case Without Prejudice and Terminating Wage Attachment*, Case No. 17-25165-GLT, Dkt. No. 45.

[65]   *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 38-41.

[66]   See *Trustee's Report of Receipts and Disbursements*, Case No. 17-25165-GLT, Dkt. No. 47.

[67]   Id.; see also *Disclosure of Compensation of Attorney for Debtor(s)*, Case No. 17-25165-GLT, Dkt. No. 22 at 45.  Attorney Willis insists he only received $3,500 for the Third Case, but his supporting proof shows payments totaling $4,000.  See *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 42, *Exhibit A*, Case No. 20-22276-GLT, Dkt. No. 139 at 72, 133-135.

[68]   See Case No. 19-21309-GLT.

[69]   See, e.g., *Summary of Your Assets and Liabilities and Certain Statistical Information*, Case No. 19-21309-GLT, Dkt. No. 1 at 9.

[70]   See *Claims Register*, Case No. 17-25165-GLT.

case (including the fifth one) given the challenge of calculating the exact amount of the tax claims.[71]  Like the last case, the Debtor reported monthly net income of $700.[72]

The Debtor's plan in the Fourth Case adopted an inexplicable tack, proposing to pay only $700 per month for 60 months.[73]  On its face, that amount addressed only about 40% of the scheduled claims.  At his deposition, Attorney Willis admitted that the plan did not commit to a feasible path because the Debtor still hoped to avoid a sale by obtaining market-rate renters.[74]  He notes, however, that the plan was confirmed on "an interim basis as a form of adequate protection" following the meeting of creditors.[75]

Ultimately, the claims filed in the Fourth Case totaled $121,492.88,[76] which was approximately $16,700 more than scheduled and roughly $7,250 over the claims asserted in the Third Case.  Again, the conciliation process came to a head about seven months later, triggering a plan modification that raised the payment obligation from $700 to $2,643.[77]  Though slightly less than the modified obligation in the Third Case, the new payment was still over $100 more than the Debtor's then gross monthly income.[78]  According to Attorney Willis, he simply deferred to the calculation necessary for final confirmation.[79]  At his deposition, he admitted that he had no

---

[71]    See *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 30; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 44:1-45:1, 61:3-62:8.

[72]    *Schedule J: Your Expenses*, Case No. 19-21309-GLT, Dkt. No. 1 at 36.

[73]    See *Chapter 13 Plan Dated March 30, 2019*, Case No. 19-21309-GLT, Dkt. No. 2.

[74]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 46:7-47:19.

[75]    See *Order Confirming Plan as Modified and Setting Deadlines for Certain Action*, Case No. 19-21309-GLT, Dkt. No. 40.

[76]    See *Claims Register*, Case No. 19-21309-GLT.

[77]    See *Conciliation Conference Minutes Dated 10/3/2019*, Case No. 19-21309-GLT, Dkt. No. 49.

[78]    See *Schedule I: Your Income*, Case No. 19-21309-GLT, Dkt. No. 1 at 33-34; *Schedule J: Your Expenses*, Case No. 19-21309-GLT, Dkt. No. 1 at 35-36.

[79]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 47:24-49:8.

updated information at the time indicating improved rental income.[80]  Still, Attorney Willis

believed the Debtor could obtain between $1,000 and $1,500 per month for each property based

on his market research.[81]  The Court entered the proposed confirmation order on October 4, 2019.[82]

Following final confirmation, Attorney Willis spoke to the Debtor several times

and believed that he would be contacting a realtor about 110 Cherry Street, but the intervening

COVID-19 pandemic made a sale impossible.[83]  By March 2020, the chapter 13 trustee sought

dismissal of the Fourth Case, citing payment arrears totaling $11,658.[84]  As always, the Debtor did

not respond, and the Court dismissed the case on June 5, 2020.[85]  Adding to the sense of déjà vu,

the chapter 13 trustee again reported total receipts of $7,000 over 14-months and a disbursement

of $2,500 to Attorney Willis for the balance of his $4,000 fee.[86]

    E.    <u>The Fifth Case (2020)</u>

On July 31, 2020, 56 days after dismissal of the Fourth Case, Attorney Willis filed

the present chapter 13 case on the Debtor's behalf ("Fifth Case").[87]  Once again, the Debtor's goal

---

[80]    <u>Id.</u> at 49:24-50:8.

[81]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 73; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 46:21-47:6.

[82]    <u>See</u> *Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions*, Case No. 19-21309-GLT, Dkt. No. 48.  As this Court explained in *In re Roebuck*, "interim confirmation . . . is unique local practice employed to provide adequate protection to secured and priority creditors pending 'final' plan confirmation" made necessary because "the Western District of Pennsylvania is a 'conduit district,' meaning that all payments to creditors—including post-petition mortgage and car payments—are made by the Trustee."  <u>In re Roebuck</u>, 618 B.R. 730, 732 (Bankr. W.D. Pa. 2020).

[83]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 50-51.

[84]    <u>See</u> *Certificate of Default Requesting Dismissal of Case*, Case No. 19-21309-GLT, Dkt. No. 51.

[85]    <u>See</u> *Order Dismissing Case Without Prejudice and Terminating Wage Attachment*, Case No. 17-25165-GLT, Dkt. No. 55.

[86]    <u>See</u> *Trustee's Report of Receipts and Disbursements*, Case No. 19-21309-GLT, Dkt. No. 57; <u>see also</u> *Disclosure of Compensation of Attorney for Debtor(s)*, Case No. 19-21309-GLT, Dkt. No. 1 at 53.

[87]    <u>See</u> Case No. 20-22276-GLT.

was to retain all three properties.[88]  This time, however, the sheriff's sale was stayed due to the pandemic so there was no urgency.[89]

      The schedules were almost entirely carried over from the prior cases despite a three-week extension.[90]  Incredibly, the Debtor once again listed his total debt as $104,791.71 even though the filed claims were approximately $16,700 higher in the Fourth Case.[91]  His gross monthly income rose to $2,800, and his monthly net income similarly increased to $1,000.[92]  Attorney Willis also disclosed that he agreed to accept a legal fee of $4,000 for the Fifth Case and already received $1,300 prepetition.[93]

      The Debtor's plan in the Fifth Case followed the same patently flawed approach as the plan in the Fourth Case except that it offered a monthly payment of $1,000, rather than $700.[94]  Attorney Willis obviously knew that would be insufficient to fully fund a confirmable plan.[95]  Though he advised that a sale of 110 Cherry Street would be the best option, Attorney Willis purportedly believed the Debtor could make up the shortfall by collecting market-rate rents from both properties.[96]  But Attorney Willis was aware that the Debtor's daughter was living at 108 Cherry Street and paying below market rent ($500) on an irregular basis.[97]  And he also knew the

---

[88]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 53:20-54:1.

[89]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 56.

[90]    Attorney Willis testified that the delay was likely due to his schedule or needing the Debtor to review him. *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 52:6-53:4.

[91]    See *Summary of Schedules*, Case No. 20-22276-GLT, Dkt. No. 20 at 1.

[92]    See *Schedule I: Your Income*, Case No. 20-22276-GLT, Dkt. No. 20 at 27-28; *Schedule J: Your Expenses*, Case No. 19-21309-GLT, Dkt. No. 20 at 29-30.

[93]    See *Disclosure of Compensation of Attorney for Debtor(s)*, Case No. 20-22276-GLT, Dkt. No. 20 at 48.

[94]    See *Chapter 13 Plan Dated August 22, 2020*, Case No. 20-22276-GLT, Dkt. No. 21.

[95]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 54:2-10.

[96]    Id. at 54:11-24 (opining that market rent in 2020 was now closer to $1,500 per month).

[97]    Id. at 28:16-29:2, 55:6-17

tenant renting 110 Cherry Street was suffering from a serious illness and otherwise could not be evicted due to the pandemic.[98]

Following scheduling delays,[99] the meeting of creditors was finally held in November 2020.  Notably, the Debtor revealed that none of the properties were insured and apparently never had been.[100]  While the chapter 13 trustee observed that a significantly higher payment was necessary, there was no discussion of the plan or feasibility.[101]  Just like last time, the inevitable payment hike was put off until after the claims bar date, with Attorney Willis reasoning that "I think some of those numbers are going to come down."[102]

Of course, the claims did not decrease by the bar date.  Quite the contrary, they rose to $130,879.33—an increase of nearly $9,400 over the Fourth Case despite the Debtor's payments.[103]  Like those before it, the Fifth Case culminated in a conciliation conference roughly six months after the petition was filed.[104]  To bridge the funding gap, the Debtor agreed to raise the monthly payment obligation to $3,316—*an amount over $500 more than his gross monthly*

---

[98]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 57; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 64:5-14, 84:11-85:1.  Attorney Willis also stated that the tenant's illness was "making it difficult to get the realtor in to show the property," but there is no evidence a realtor was even approached. *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 57.

[99]    The meeting of creditors was twice rescheduled from September 21, 2020 to November 16, 2020 after entries indicating the prior scheduled meetings were not held.  See Case No. 20-22276-GLT, Dkt. Nos. 23, 28, 29, 31, 32.  The cause is not apparent from the docket, but Attorney Willis' deposition testimony suggests that the Debtor failed to appear multiple times.  *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 86:10-14.

[100]    *Exhibit G*, Case No. 20-22276-GLT, Dkt. No. 139 at 465.  Although the attached exhibit is not an official transcript of the meeting of creditors, Attorney Willis submitted it in support of his response so the Court will consider it.

[101]    Id.

[102]    Id.

[103]    See *Claims Register*, Case No. 20-22276-GLT.

[104]    See *Conciliation Conference Minutes Dated 2/4/2021*, Case No. 20-22276-GLT, Dkt. No. 53.

*income*.[105]  For his part, Attorney Willis believes no representation was made as to the feasibility

or source of that payment, which is itself troubling.[106]  Regrettably, the Court once more accepted

the chapter 13 trustee's recommendation and entered the proposed confirmation order on February

5, 2021.[107]

Given the monthly plan obligation, Attorney Willis had "several conversations"

with the Debtor about needing to "save the case" by selling 110 Cherry Street.[108]  At the time of

his deposition, his "recollection" was that the Debtor agreed.[109]  Attorney Willis followed-up with

the Debtor's progress telephonically, but "nothing was provided . . . to me."[110]

Six months later, the chapter 13 trustee moved to dismiss the Fifth Case on account

of a payment default in the amount of $17,212.[111]  This time, when the Debtor failed to respond,

the Court dismissed the case on October 13, 2021 but also ordered him to show cause why the

Court should not impose a one-year filing bar given the history of these cases.[112]  Attorney Willis

filed an initial response on the Debtor's behalf arguing that he acted in good faith and now intended

to sell the Property.[113]  Two weeks later, however, the Debtor filed a second response with the

---

[105]   <u>Id.</u>

[106]   *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 56:2-25, 57:9-14.

[107]   <u>See</u> *Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions*, Case No. 20-22276-GLT, Dkt. No. 52.

[108]   *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 57:18-25.

[109]   <u>Id.</u> at 58:1-3.

[110]   <u>Id.</u> at 58:6-13.

[111]   <u>See</u> *Certificate of Default Requesting Dismissal of Case*, Case No. 20-22276-GLT, Dkt. No. 55.

[112]   <u>See</u> *Order (A) Dismissing Bankruptcy Case and (B) Setting Hearing to Determine Whether Dismissal should be with Prejudice*, Case No. 20-22276-GLT, Dkt. No. 59.

[113]   <u>See</u> *Response to Order (A) Dismissing Bankruptcy Case and (B) Setting Hearing to Determine Whether Dismissal Should Be with Prejudice*, Case No. 20-22276-GLT, Dkt. No. 62.

assistance of Attorney David Z. Valencik in which he laid the blame for the questionable pattern of filings on Attorney Willis' advice.[114]

At the show cause hearing, Attorney Valencik asked that the case be reinstated (with the municipality's consent) so that 110 Cherry Street could be sold under an amended plan.[115] Though acknowledging the Debtor's past failures, Attorney Valencik insisted that he could only "fix this moving forward"[116] and deferred to Attorney Willis to answer for them.[117]  Curiously, Attorney Willis maintained "the intent was always to liquidate one of the properties in all cases" even though no concrete steps had ever been taken.[118]  When pressed, he also could not satisfactorily explain repeatedly filing new chapter 13 cases that obviously suffered from the same defects that led to the dismissal of the prior case.[119]

In the end, the Court indicated that it would entertain a consent order vacating dismissal if it contained strictures for the completion of the case.[120]  As the pattern of these cases raised serious questions about Attorney Willis' conduct, the Court directed the Trustee to investigate and file a report outlining its findings and any recommendations for further proceedings ("Investigation Order").[121]  The *Investigation Order* specifically instructed the Trustee to address:

> (1)   Whether Attorney Willis violated Fed. R. Bankr. P. 9011 and/or the Rules of Professional Conduct by repeatedly filing chapter 13 petitions (and all subsequent pleadings) on behalf of the Debtor;

---

[114]   See *Supplemental Response to Order (A) Dismissing Bankruptcy Case and (B) Setting Hearing to Determine Whether Dismissal Should Be with Prejudice*, Case No. 20-22276-GLT, Dkt. No. 65.

[115]   *Transcript of November 17, 2020 Hearing*, Case No. 20-22276-GLT, Dkt. No. 99 at 5:8-6:21.

[116]   Id. at 8:25-9:12.

[117]   Id. at 10:17-20.

[118]   Id. at 11:7-11:13, 13:23-16:21.

[119]   See, e.g., id. at 18:9-21.

[120]   Id. at 23:21-24:18.

[121]   *Investigation Order*, Case No. 20-22276-GLT, Dkt. No. 96.

(2)      Whether Attorney Willis knowingly took advantage of "blind spots" in the chapter 13 plan conciliation process in order to perpetually delay and frustrate creditors and otherwise abuse the bankruptcy system; and

(3)      Whether Attorney Willis was grossly overcompensated for his services in these cases and, if so, whether and to what degree disgorgement is appropriate.[122]

As it was unknown what, if any, further action would be necessary following the report, the Court did not initially solicit a response from Attorney Willis.[123]  It did, however, "encourage[] the chapter 13 trustee to consider the Court's concerns and recommend measures designed to detect similar potential patterns of abuse more quickly."[124]

F.    The Trustee's Report

After completing an investigation that included depositions of both Attorney Willis and the Debtor, a review of documents provided by Attorney Willis, and discussions with the chapter 13 trustee, the Trustee filed its *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee* ("Report").[125]  In summary, the Trustee found that Attorney Willis: (a) violated Bankruptcy Rule 9011 in several respects; (b) may have violated the Pennsylvania Rules of Professional Conduct; (c) exploited blind spots in the chapter 13 conciliation process; and (d) received compensation that exceeded the reasonable value of his services.[126]  Beyond these matters, the investigation also uncovered other concerning issues.

---

[122]    Id. at 10.

[123]    See also *Order*, 20-22276-GLT, Dkt. No. 110 (denying Attorney Willis leave to file a response until after the chapter 13 trustee's response deadline).

[124]    *Investigation Order*, Case No. 20-22276-GLT, Dkt. No. 96 at 10.

[125]    *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶ 7.  Notably, the Debtor executed a voluntary waiver of the attorney-client privilege in connection with the investigation.  Id. at ¶ 8.

[126]    Id. at ¶ 2.

First, Attorney Willis did not produce evidence that the Debtor authorized the filing of the petitions and pleadings before they were submitted.  For the Second and Third Cases, the "wet signatures" on the petition, schedules, and plan are undated, calling into question when the Debtor reviewed and signed them.[127]  Worse still, the "wet signatures" on the petitions for the Fourth and Fifth Cases post-date the filing in each case by more than a week.[128]  This is particularly troubling since Attorney Willis was previously censured for filing petitions without a wet signature.[129]

Next, Attorney Willis' deposition revealed new details about his compensation for the Fifth Case.  Not only did he receive his full $4,000 fee (just as he had in the three prior cases), but the Debtor paid him an additional $1,500 after the case was dismissed to respond to the order to show cause.[130]  To date, Attorney Willis has not updated his Bankruptcy Rule 2016(b) statement despite having received more in connection with the Fifth Case than he initially disclosed.

Finally, the Court observes that the Debtor's testimony was self-serving and full of convenient memory deficits.  For his part, the Debtor insisted that he *never* understood that he needed to sell any of the properties or raise rent for any of his cases to succeed.[131]  Still, he knew each case was dismissed was because he "wasn't paying enough money" to fund the plan.[132]  When

---

[127]     Id. at ¶¶ 21-22, 26-29.

[128]     Id. at ¶¶ 32, 34-35, 40, 42-43.  In the Fourth Case, the "wet signatures" are dated April 8, 2019, nine days after the petition, schedules, and plan were filed.  In the Fifth case, the "wet signatures" were dated August 14, 2020, 14-days after the documents were filed.  Id.

[129]     See In re Willis, 604 B.R. 206, 211-12 (Bankr. W.D. Pa. 2019).

[130]     *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶ 46; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 58:14-59:18.

[131]     *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶¶ 16, 22, 29, 36-37, 44-45.

[132]     *Deposition of Vincent P. Kelly.*, Case No. 20-22276-GLT, Dkt. No. 139 at 91:6-17, 102:11-20, 112:4-10.

asked how he thought his cases could succeed, he responded, "I don't know, sir.  I don't know how this works."[133]

Ultimately, the Trustee recommended that the Court cancel all the retainer agreements between Attorney Willis and the Debtor and require Attorney Willis to disgorge all fees received for each of the four cases.[134]  The Trustee also asserted that Attorney Willis should submit briefing on whether the Court should refer him to the Disciplinary Board of the Supreme Court of Pennsylvania.[135]  Procedurally, the Court construed the *Report* and its recommendations as a request for affirmative relief and set a deadline for Attorney Willis to respond.

G.    The Chapter 13 Trustee's Response

Following the *Report*, the chapter 13 trustee filed a candid response detailing her view of the conciliation process and its systemic vulnerabilities.  She acknowledged that the perceived "blind spots" were likely created in part by her "current case" focus and inclination towards giving debtors a chance even when "the effort may be a reach."[136]  The chapter 13 trustee explained that because a debtor's income and expenses may ebb and flow, she ordinarily defers to debtor's counsel on the feasibility of "aggressive" plan obligations.[137]  She also emphasized weighing the tacit approval of secured and priority creditors, noting that aggressive plans may benefit general unsecured creditors more than alternative outcomes.[138]  Should the debtor's under-performance create "an apparently insurmountable bar to plan completion," the chapter 13 trustee

---

[133]  Id. at 39:24-40:7.

[134]  *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at 31.

[135]  Id.

[136]  *Chapter 13 Trustee's Response to Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. 114 at ¶¶ 3, 10.

[137]  Id. at ¶ 5.

[138]  Id. at ¶¶ 6-9.

seeks dismissal without prejudice, which she conceded may also form a blind spot for abusive filers.[139]

Although "extremely sensitive to the Court's concerns," the chapter 13 trustee stressed that abuse is rare and her expressed preference for erring on the side of debtors absent creditor opposition.[140]  She contended that the current default procedures, while imperfect, are an efficient means of filtering out cases of "marginal or doubtful feasibility" without materially increasing the administrative burdens.[141]  The chapter 13 trustee also described newly adopted procedures to internally flag and monitor certain serial filers proposing payment obligations that exceed the monthly net income on *Schedule J*.[142]

H.   Attorney Willis' Omnibus Response

Attorney Willis filed a lengthy *Omnibus Response* to the *Report* denying any bad faith or misconduct under Bankruptcy Rule 9011 or the Rules of Professional Conduct.[143]  He tried to dispel the notion that there were any serious issues at play, let alone systemic problems.  Instead, Attorney Willis urged the narrative that the Debtor's chapter 13 cases did not succeed for the same reasons others fail: loss of employment, inability to increase income, illness, and the pandemic.[144]  In so doing, he characterized the *Report* as unfairly casting him as a "guarantor" of the Debtor's plan and seeking to punish him simply because the Debtor failed to heed his advice.[145]

---

[139]   <u>Id.</u> at ¶¶ 4, 11.

[140]   <u>Id.</u> at ¶¶ 12-13.

[141]   <u>Id.</u> at ¶ 12.

[142]   <u>Id.</u> at ¶ 15.

[143]   *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 20.

[144]   <u>Id.</u> at ¶¶ 6, 73-76.

[145]   <u>Id.</u> at 20.

As for advancing the Debtor's serial filings, Attorney Willis asserted that his conduct as counsel was at all times reasonable.[146]  In broad strokes, he argued that plan completion was always possible because a sale of 110 Cherry Street could provide the necessary funding if the Debtor could not increase his rental income.[147]  Attorney Willis emphasized that his duty was to abide by the Debtor's decision and that market research supported the viability of the rental income strategy.[148]  He further contended that he owed no fiduciary duty to the creditors who could protect themselves, but noted that they were always protected by the Debtor's equity in 110 Cherry Street.[149]  From this perspective, Attorney Willis posited that his conduct could not be any more unreasonable than that of Attorney Valencik who was ultimately permitted to continue the Fifth Case.[150]

I.       The Proposed Settlement

The Court conducted an initial hearing on the *Report* in May 2022.  Ironically, both sides agreed that further proceedings were unnecessary.  The Trustee argued that the existing record easily established Attorney Willis' misconduct and dismissed the *Omnibus Response* as an "extremely voluminous . . . red herring" because the relevant standards are objective.[151]  In contrast, Attorney Willis asserted that the evidence amply showed that his representation of the Debtor was diligent and reasonable despite disappointing outcomes.[152]  After an extended

---

[146]     Id. at 26-27.

[147]     Id. at 28, 35.

[148]     Id. at 33-35.

[149]     Id. at 32-35.

[150]     Id. at 31.

[151]     *Transcript of May 4, 2022 Hearing*, Case No. 20-22276-GLT, Dkt. No. 155 at 6:3-7:20, 8:21-9:14.

[152]     Id. at 13:5-7, 14:20-15:15.

colloquy, the Court offered its preliminary observations and continued the matter to allow the parties a chance to explore the possibility of a consensual resolution.[153]

Prior to the continued hearing, Attorney Willis, the Trustee, and the chapter 13 trustee negotiated a settlement of the issues raised by the *Report* and submitted their stipulation for Court approval ("Stipulation").[154]  Under the *Stipulation*, Attorney Willis agreed to an $8,000 sanction payable to the chapter 13 trustee for distribution to Debtor's creditors (in the Fifth Case) consisting of:

> (i) the cancellation of his retainer agreement in the Fifth Case and disgorgement of the $5,500 he received;
>
> (ii) the disgorgement of $2,000 of fees collected in the Fourth Case; and
>
> (iii) a $500 fine ($250 per incident) based on his inability to prove that the Debtor reviewed the post-dated petitions for the Fourth and Fifth Cases prior to filing.[155]

Additionally, Attorney Willis made the following "commitments" to modifying his practice:

> (i) He will ensure that debtors' real estate is appropriately insured or disclose the lack of coverage;
>
> (ii) He will fully inform his clients of their duties and obligations with respect to any proposed sale and ensure that any sale process moves forward expeditiously;
>
> (iii) He will perform a reasonable inquiry into the amounts owed to creditors and ensure schedules contain updated information;
>
> (iv) He will "make reasonable inquiry and analysis of whether a debtor will be able to submit a feasible bankruptcy plan that can be performed until completion . . . and not simply whether a plan can be confirmed"; and

---

[153]     Id. at 30:11-33:8; see also *Order*, Case No. 20-22276-GLT, Dkt. No. 151.

[154]     *Settlement Stipulation by and Between Attorney Willis, United States Trustee, and Chapter 13 Trustee*, Case No. 20-22276-GLT, Dkt. No. 170-1.

[155]     Id. at ¶¶ 4-5.

>(v) He will obtain a debtor's original, physical signature on any document
>that is signed by the debtor before it is filed with the Court.[156]

Despite these provisions, Attorney Willis did not admit any liability under Bankruptcy Rule 9011 or otherwise.[157]

When the matter came before the Court, it declined to approve the *Stipulation* as submitted.  Because the *Stipulation* did not address the recommendation that Attorney Willis be referred to the disciplinary board, the Court confirmed that the Trustee determined a referral was unnecessary.[158]  With that clarified, the Court expressed dissatisfaction with two aspects of the *Stipulation*.  First, the Court found that the proposed monetary sanction, while reasonable, should not be credited towards the Debtor's plan obligation given his complicity in the abusive filings. Instead, the Court held that any sanction should be earmarked for pro-rata distribution to creditors without regard to any amount paid by the Debtor.  Second, the Court was underwhelmed by Attorney Willis' commitments, particularly without an admission of wrongdoing.  Aside from just reiterating the obligations of every practitioner, the Court observed that the commitments were empty since Attorney Willis believed that he substantially complied with them.  As such, the Court held that it would not approve a resolution without an acknowledgment that he violated Bankruptcy Rule 9011 and abused the chapter 13 process.[159]

---

[156]    Id. at ¶¶ 1-3, 5.

[157]    Id. at ¶ 7.

[158]    At both the May and June 2022 hearings, the Court indicated that any disciplinary referral was best left to the discretion of the Trustee.  Since Court authorization is not required for the Trustee to make such a referral, there appeared to be little utility to litigating the merit of one.

[159]    While a settlement without an admission of wrongdoing was a non-starter for the Court, it does not fault the Trustee for proposing the *Stipulation* without one.  Even with the Court's concerns, the *Stipulation* significantly narrowed the issues and provided a framework for the efficient, uncontested resolution of this matter.

Given these concerns, the Court proposed to take the matter under advisement and enter a written *Memorandum Opinion* finding Attorney Willis violated Bankruptcy Rule 9011 and reaffirming the standards applicable to chapter 13.[160]  That said, the Court would agree to limit the monetary sanction to the $8,000 outlined in the *Stipulation* with the caveat that the funds be earmarked for creditors.[161]  Moreover, the Court would neither refer Attorney Willis to the disciplinary board, nor impose any restriction on his ability to practice before this Court in a manner consistent with the Bankruptcy Code, Bankruptcy Rules, and the applicable Rules of Professional Conduct.[162]  But, in addition to the public admonition, the Court reserved the right to impose non-monetary directives based on the *Stipulation*'s commitments.[163]  The Court concluded the hearing by setting a deadline for Attorney Willis to assess the proposal and elect how he wanted to proceed.[164]

Ultimately, Attorney Willis declined to withdraw his consent to the *Stipulation* or submit further evidence or briefing.[165]  Upon reflection, he also acknowledged that his conduct, albeit unintentionally, allowed *the Debtor* to abuse and manipulate the bankruptcy system.[166]  The Court then took the matter under advisement.

J.     The Debtor's Epilogue

To address certain points raised by Attorney Willis, the Court offers a few observations about the Fifth Case since his story has parted from the Debtor's.  As previewed, the

---

[160]     *Order*, Case No. 20-22276-GLT, Dkt. No. 176 at at ¶¶ 1-2(a).

[161]     Id. at ¶ 2(b).

[162]     Id. at ¶¶ 2(c)-(d).

[163]     Id. at ¶ 2(d).

[164]     Id. at 3.

[165]     *Status Report*, Case No. 20-22276-GLT, Dkt. No. 178 at ¶ 3.

[166]     Id. at ¶¶ 5-9.

Court vacated the dismissal of the Fifth Case in December 2021, but the case has now been converted to chapter 7.  While the Debtor promptly moved to employ a real estate broker as a condition of reinstatement, the broker failed to list 110 Cherry Street for sale until March 2022.[167] And then the tenant did not vacate until May 2022.[168]  When 110 Cherry Street finally sold in July 2022, the sale price of $87,150 was far less than the scheduled value of $110,000.[169]  Since the municipal claims continued to accrue interest, the impact of the sale was not as significant as first hoped.[170]  Meanwhile, the Debtor apparently stopped making plan payments in June 2022.[171]  By November 2022, the Fifth Case once again devolved into aimlessness, with the Debtor pleading for more time to increase his income or consider selling 108 Cherry Street.[172]  Enough being enough, the Court authorized the chapter 13 trustee to disburse the funds on hand to creditors, intending to convert the case afterward.[173]

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L).

---

[167]    *Order*, Case No. 20-22276-GLT, Dkt. No. 201 (imposing sanctions against the real estate broker for his lack of candor).

[168]    *Status Report*, Case No. 20-22276-GLT, Dkt. No. 140.

[169]    Cf. *Report of Sale*, Case No. 20-22276-GLT, Dkt. No. 195; *Schedule A/B: Property*, Case No. 20-22276-GLT, Dkt No. 20 at 4.

[170]    *Transcript of November 30, 2022 Hearing*, Case No. 20-22276-GLT, Dkt. No. 217 at 3:10-19.

[171]    Id. at 7:2-5.

[172]    Id. at 3:20-6:22.  Notably, the Debtor could not explain why the five months prior to the hearing was insufficient to chart a new course.

[173]    *Order of Court*, Case No. 20-22276-GLT, Dkt. No. 216.

## III.   POSITIONS OF THE PARTIES

### A.   The Trustee

The Trustee asserts that Attorney Willis violated Bankruptcy Rule 9011(b) in the Debtor's cases in several ways.  First, he argues that Attorney Willis' serial filings on behalf of the Debtor lacked a proper purpose.  The Trustee contends that Attorney Willis knew or should have known as early as the Third Case that there was no prospect of a feasible plan.[174]  He emphasizes Attorney Willis' subjective belief that a plan could have succeeded, either by sale or increasing rental income, was unreasonable since there was no material change in the facts from case to case.[175]  Given the Debtor's history of inaction, the Trustee asserts that there was no objective basis to believe the Debtor's performance would improve.[176]  In fact, he posits that Attorney Willis effectively acknowledged that by filing directionless plans that neither contemplated increased payments nor a sale.[177]

Next, the Trustee asserts that Attorney Willis violated Bankruptcy Rule 9011(b) by repeatedly filing knowingly inaccurate schedules.[178]  He argues that Attorney Willis rebuffed his duty to reasonably inquire into the claims and instead carried outdated information from the Second Case into all subsequent schedules.[179]  As a result, the amounts listed in *Schedule E/F* were intentionally understated by increasing margins despite being filed under the penalty of perjury.

---

[174]   *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶ 55.

[175]   Id. at ¶¶ 56-57.

[176]   Id. at ¶ 57.  The *Report* notes that the Debtor professed ignorance that anything was required of him, but the Court does not find that credible.

[177]   Id. at ¶¶ 59-60.

[178]   Id. at ¶ 58.

[179]   Id.

The Trustee also contends that Attorney Willis violated Bankruptcy Rule 9011(b) by filing the Fourth and Fifth Cases without first obtaining the Debtor's physical signature.[180] Though focused on the post-dated signatures in those cases, he also points to the undated signatures on many other documents to highlight a consistent inability to prove pre-authorization.[181]   The Trustee finds this particularly troubling given that Attorney Willis was previously censured by Judge Deller for this conduct.[182]

Taken together, the Trustee concludes that these violative acts and omissions targeted blind spots in the conciliation process and allowed the Debtor's cases to continue with no probability of success.[183]   He asserts that Attorney Willis "knew that the Plans would proceed through conciliation and confirmation unchallenged" if the Debtor ultimately agreed to an unfeasible payment.[184]   From there, Attorney Willis knew that it would take months before the arrears ballooned enough to prompt the chapter 13 trustee to seek dismissal without prejudice.[185] While the Trustee is agnostic about Attorney Willis' specific intent to frustrate or delay creditors, he maintains the strategy was nonetheless purposeful based on Attorney Willis' experience.[186] Indeed, the Trustee suggests that the *Omnibus Response* essentially defends the practice of capitalizing on blind spots within the conciliation process.[187]

---

[180]    Id. at ¶¶ 61-62.

[181]    Id.

[182]    *Transcript of May 4, 2022 Hearing*, Case No. 20-22276-GLT, Dkt. No. 155 46:14-20.

[183]    *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶ 68.

[184]    Id. at ¶ 72

[185]    Id. at ¶ 71.

[186]    Id. at ¶¶ 71-72.

[187]    *Transcript of May 4, 2022 Hearing*, Case No. 20-22276-GLT, Dkt. No. 155 45:16-46:1.

Finally, given Attorney Willis' problematic conduct and the "modest results" obtained in these cases, the Trustee argues that attorney's fees in the amount of $17,500 are objectively unreasonable and exceeds the value of his services.[188]

B.    Attorney Willis

Frankly, the *Omnibus Response* is a lot to unpack.[189]  From the outset, Attorney Willis disputes that the Debtor's bankruptcies were "identical cases refiled with the same goals and objectives that 'were destined to fail.'"[190]  He emphasizes that not only did the Debtor's strategy change over time, but so did the underlying circumstances.[191]  Events such as the pandemic, his daughter's loss of employment, and the tenant's serious illness were all beyond the Debtor's control and impeded his ability to complete his plans as intended.[192]  In this sense, Attorney Willis challenges the *Report*'s narrative that the Debtor's cases were atypical or warrant this level of attention.

The primary refrain of the *Omnibus Response* is that "[Attorney] Willis always had a reasonable (and accurate) belief that Mr. Kelly could complete a plan successfully through the sale of the property."[193]  Attorney Willis admits this was not consistently the Debtor's aim, yet

---

[188]    *Investigation Report and Recommendations for Further Proceedings Submitted by the United States Trustee*, Case No. 20-22276-GLT, Dkt. No. 107 at ¶¶ 77-78.

[189]    The Court has endeavored to fairly summarize Attorney Willis' position, but it is long, scatter-shot, and inconsistent.  In the interest of keeping this section shorter than the *Omnibus Response*, the Court will save some specific arguments for the discussion.

[190]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 72.

[191]    Id. at ¶¶ 73-76.

[192]    Id.

[193]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 78 and pages 29, 31, 33, 35, 38-41.

insists it was always a viable fallback position that kept creditors adequately protected.[194]  Given

that, he asserts that the serial filings were not "legally unreasonable."[195]

Generally, Attorney Willis defends the reasonableness of his conduct by asserting

that he was entitled to rely on the Debtor's representations.[196]  He stresses that the Debtor testified

under oath at multiple conciliations that the rent could be increased to cover the plan obligations,

and that he already had a willing tenant.[197]  Although Attorney Willis "did not believe that was

[the Debtor's] best option,"[198] he states that Zillow.com supported its potential, enabling him to

argue in good faith.[199]  Moreover, Attorney Willis contends that he was ethically required to carry

out the Debtor's strategy because his disagreement was not "fundamental."[200]    When

circumstances allegedly blocked the rent increases, Attorney Willis maintains that he reasonably

believed that the Debtor would market 110 Cherry Street based on their discussions.[201]  He swears

that the Debtor was always honest and cooperative throughout their dealings and never gave him

reason to doubt.[202]

Although Attorney Willis acknowledges his failure to update *Schedule E/F* in the

last three cases, he downplays it as merely "not best practice" or "sloppy."[203]  He explains that

calculating the tax claims would have been "difficult to impossible" because the creditor may have

---

[194]      Id. at 31-32.

[195]      Id.

[196]      Id. at 26.

[197]      Id. at 25, 32

[198]      Id. at 35.

[199]      Id. at 28, 31-35.

[200]      Id. at 34-35.

[201]      Id. at 27, 31-32, 35.

[202]      Id. at 27, 32-33.

[203]      Id. at 40.

received payments or imposed additional taxes since the last filing.[204]   In hindsight, Attorney

Willis concedes that the prior proofs of claim would have been a better starting point, but argues

that perfectly accurate figures on *Schedule E/F* would not have changed anything.[205]

Attorney Willis points to the "wet signatures" in his possession as evidence that the

Debtor's filings were authorized.[206]   Based on his time records, he believes the Debtor signed each

of the four petitions on the filing date.[207]   That said, Attorney Willis admits that he cannot prove

it.[208]   He explains that clients sometimes neglect to date their signatures, as apparently happened

in the Second and Third Cases,[209] but cannot account for the post-filing dates in the Fourth and

Fifth Cases.[210]   In any event, Attorney Willis takes umbrage at the Trustee's citation of *In re Willis*,

arguing that it is completely inapposite.[211]

Next, Attorney Willis denies that he was overcompensated for his services in the

Debtor's cases.   He notes that he charged the presumptively reasonable "no-look" fee under the

local rules in each case.[212]   While contending he is entitled to this presumption,[213] Attorney Willis

asserts that his contemporaneous billing records easily establish that he provided services

exceeding the "no-look" fee in every case.[214]   The multiple filings are irrelevant.

---

[204]   Id.

[205]   Id.

[206]   Id. at 38-39.

[207]   Id. at 39.

[208]   Id.; *Settlement Stipulation by and Between Attorney Willis, United States Trustee, and Chapter 13 Trustee*, Case No. 20-22276-GLT, Dkt. No. 170-1 at ¶ 5.

[209]   *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 38-39.

[210]   Id.

[211]   Id. at 39 n.20.

[212]   Id. at 21.

[213]   Id. at 22-23.

[214]   Id. at 21.

Finally, the *Omnibus Response* does not directly address "blind spots" in the conciliation process, and it appears Attorney Willis was confused by the idea at his deposition.[215] The Court gathers that he rejects the existence of "blind spots" because the Debtor (arguably) hid nothing.  Attorney Willis asserts that the creditors were engaged, having attended both the meetings of creditors and conciliations.[216]  Given that none sought to exercise their rights—by seeking stay relief, dismissal, or bar orders—he contends that they understood the offer of adequate protection and agreed to give the Debtor a chance.[217]  Consequently, the *Omnibus Response* is fairly indignant about the suggestion that Attorney Willis owed a duty to creditors who failed to protect themselves.[218]

Continuing in a similar vein, Attorney Willis discerns nothing unusual or abusive in the conduct of the Debtor's cases.  His view appears rooted in a conviction that his actions were always reasonable and finds additional support in the apparent lack of pushback.  For example, Attorney Willis concludes that the serial filings were innately reasonable in the absence of a bar order prohibiting them.[219]  Because the Debtor did not want to sell 110 Cherry Street but had not yet increased his income, Attorney Willis figured adequate protection was an appropriate interim plan.[220]  The Debtor eventually committed to making full payments to achieve confirmation, which

---

[215]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 65:21-66:17.

[216]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 34.

[217]    Id.

[218]    Id.

[219]    Id. at 27, 30-31, 34.

[220]    Id. at 41.  Attorney Willis stresses that there is no place on the form chapter 13 plan to indicate an anticipated change in income. See id.; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 63:2-9.

Attorney Willis notes is one of the benchmarks of presumptively reasonable services.[221]  In sum,

Attorney Willis seems to be saying *this is* how chapter 13 works.

## IV.    DISCUSSION

### A.    Bankruptcy Rule 9011

#### 1.    The Applicable Standard

Generally, Bankruptcy Rule 9011(b) targets objectively unreasonable conduct and

requires attorneys to take responsibility.[222]  It provides in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later
> advocating) a petition, pleading, written motion, or other paper, an attorney
> or unrepresented party is certifying that to the best of the person's
> knowledge, information, and belief, formed after an inquiry reasonable
> under the circumstances—
>
> > (1) it is not being presented for any improper purpose, such as to
> > harass or to cause unnecessary delay or needless increase in the cost
> > of litigation;
> >
> > (2) the claims, defenses, and other legal contentions therein are
> > warranted by existing law or by a nonfrivolous argument for the
> > extension, modification, or reversal of existing law or the
> > establishment of new law;
> >
> > (3) the allegations and other factual contentions have evidentiary
> > support or, if specifically so identified, are likely to have evidentiary
> > support after a reasonable opportunity for further investigation or
> > discovery . . .[223]

---

[221]    See W.PA.LBR 2016-1(g)(4) ("counsel will file a Chapter 13 plan that meets with the requirements of Local Bankruptcy Form 10 (Chapter 13 Plan) and is capable of confirmation.").  In a footnote, Attorney Willis observes that the local rule only requires a plan "capable of being confirmed, *not capable of being completed.*"  *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 23 n.13 (emphasis added).

[222]    See In re Taylor, 655 F.3d 274, 282 (3d Cir. 2011) (citing Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215, 1225 (3d Cir.1995)); Cruz v. Savage, 896 F.2d 626, 630 (1st Cir. 1990).  Cases decided under Fed. R. Civ. P. 11 apply to Bankruptcy Rule 9011.  Stuebben v. Gioioso (In re Gioioso), 979 F.2d 956, 959-60 (3d Cir. 1992).

[223]    Fed. R. Bankr. P. 9011(b)(1)-(3).

Under subsection (b)(2), the focus is not whether the claim asserted was frivolous, but whether the attorney conducted an adequate inquiry into the facts and law before filing the claim.[224] Similarly, the "concern" under subsection (b)(3) "is not the truth or falsity of the representation in itself, but rather whether the party making the representation reasonably believed it at the time to have evidentiary support."[225]

Conduct allegedly violative of Bankruptcy Rule 9011 is evaluated by a "standard . . . of reasonableness *under the circumstances*."[226] The United States Court of Appeals for the Third Circuit has defined "reasonableness" as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact."[227] Responsibility for due diligence is "personal" and "nondelegable,"[228] and a "pure heart" will not excuse an "empty head."[229] The Third Circuit has held that Bankruptcy Rule 9011 requires a holistic approach that examines "all the material circumstances."[230] Guiding considerations include:

(i) the complexity of the subject matter;

(ii) the party's familiarity with it;

(iii) the amount of time available to conduct the factual and legal investigation

(iv) the ease or difficulty of accessing the requisite information.

(v) the need to rely on a client for the underlying factual information;

---

[224]    See Ettinger & Assocs. v. Miller (In re Miller), 730 F.3d 198, 203 (3d Cir. 2013); In re Dahlgren, 494 F. App'x 201, 204 (3d Cir. 2012); In re Excello Press, Inc., 967 F.2d 1109, 1111-1112 (7th Cir. 1992).

[225]    In re Taylor, 655 F.3d at 282.

[226]    Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc., 498 U.S. 533, 551, 111 S. Ct. 922, 933, 112 L. Ed. 2d 1140 (1991) (emphasis in original); see In re Taylor, 655 F.3d at 282.

[227]    Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir.1991) (quoting Jones v. Pittsburgh Nat. Corp., 899 F.2d 1350, 1359 (3d Cir. 1990)) (internal quotations omitted).

[228]    Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1278 (3d Cir. 1994).

[229]    In re Taylor, 655 F.3d at 284; Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987)

[230]    In re Taylor, 655 F.3d at 284.

(vi) the plausibility of the legal position advocated;

(vii) whether the case was referred by another lawyer.[231]

In sum, the standard requires "due diligence and objective reasonableness—not perfect research or utter prescience."[232]   Still, violations of Bankruptcy Rule 9011 "might be caused by inexperience, incompetence, willfulness, or deliberate choice."[233]

### 2.        Violations of Bankruptcy Rule 9011

Attorney Willis claims not to perceive any "blind spots" in the chapter 13 conciliation process or any deviation in his conduct from standard practice, which if true, is a huge problem.  While the Court and the chapter 13 trustee must accept responsibility for unintentionally fostering this attitude, Attorney Willis' alleged understanding of chapter 13 is replete with manipulative practices.  Indeed, his defense is often schizophrenic in that he wishes to paint his representation as diligent yet also disclaim responsibility for glaring deficits.  As outlined in the next several sections of this *Memorandum Opinion*, Attorney Willis' patently unreasonable behavior resulted in many violations of Bankruptcy Rule 9011(b).

### i.        Misrepresenting the Debtor's Pre-filing Verification

The Debtor's "wet signatures" on the petitions and schedules are undated in the Second and Third Cases, and post-date the filing of the petition in the Fourth and Fifth Cases.[234]   Attorney Willis acknowledges his responsibility to ensure the debtors review documents before

---

[231]      See Navarro-Ayala v. Nunez, 968 F.2d 1421, 1425 (1st Cir. 1992); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988).

[232]      See Maine Audubon Soc. v. Purslow, 907 F.2d 265, 268 (1st Cir. 1990).

[233]      Cruz v. Savage, 896 F.2d at 631.

[234]      *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 84-116.

filing but cannot confirm that he did so here.[235]  And Judge Deller previously sanctioned him for

failing to "obtain and retain actual signatures of his clients" in accordance with the local rules.[236]

So there is no question that Attorney Willis should know better.  Unfortunately, the *Omnibus*

*Response* suggests he still does not fully understand his responsibilities.  As explained below, this

concern is heightened by inconsistencies between certain signed declarations attached to the

*Omnibus Response* as exhibits and those previously filed in each case.  Accordingly, the Court

will articulate how Attorney Willis' handling of the Debtor's "wet signatures" violated Bankruptcy

Rule 9011(b)(3).

        A debtor is required to sign their petition and schedules for several reasons.

Clearly, a debtor's signature on a petition evidences their consent to the bankruptcy filing.[237]  But

"[a]ll petitions, lists, schedules, statements and amendments" also require verifications or unsworn

declarations executed by the debtor in accordance with 28 U.S.C. § 1746.[238]  Indeed, by signing

the petition and schedules where called for, a debtor certifies under the penalty of perjury that the

information contained in the document is true and correct.[239]  Under Bankruptcy Rule 9011(a), an

attorney cannot endorse these documents on a debtor's behalf.[240]  After all, "logic dictates that

---

[235]    *Settlement Stipulation by and Between Attorney Willis, United States Trustee, and Chapter 13 Trustee*, Case No. 20-22276-GLT, Dkt. No. 170-1 at ¶ 5.

[236]    In re Willis, 604 B.R. at 212-13.

[237]    In re Wenk, 296 B.R. 719, 727 (Bankr. E.D. Va. 2002)

[238]    Fed. R. Bankr. P. 1008.

[239]    See Briggs v. LaBarge (In re Phillips), 317 B.R. 518, 523 (B.A.P. 8th Cir. 2004), aff'd in part, 433 F.3d 1068 (8th Cir. 2006); Schwab v. Tanribilir (In re Klitsch), 587 B.R. 287, 292 (Bankr. M.D. Pa. 2018), opinion corrected, No. 5-17-BK-01298-JJT, 2018 WL 5733715 (Bankr. M.D. Pa. Oct. 31, 2018); In re Whitehill, 514 B.R. 687, 691 (Bankr. M.D. Fla. 2014); In re Stomberg, 487 B.R. 775, 807 (Bankr. S.D. Tex. 2013).

[240]    See In re Willis, 604 B.R. at 212; In re Klitsch, 587 B.R. at 292; In re Whitehill, 514 B.R. at 691; U.S. Tr. v. Jones (In re Alvarado), 363 B.R. 484, 491 (Bankr. E.D. Va. 2007); In re Wenk, 296 B.R. at 727.

only the [d]ebtor can state under oath that the information provided in her bankruptcy schedules and in her statement of affairs is true and correct."[241]

Electronic signatures—"/s/" followed by a typewritten name—are ubiquitous in bankruptcy practice due to mandatory electronic filing and the prevalence of digital case preparation.[242]  Nevertheless, they are not really signatures.  By local rule, an attorney's log-in and password to the CM/ECF System is the functional equivalent of a signature,[243] while the electronic signature simply identifies the Filing User visually in a signature block.[244]  As a practical matter, debtors do not even affix their own electronic signatures to the documents.  A debtor's electronic signature is only the filing attorney's representation under Bankruptcy Rule 9011 that the debtor did, in fact, sign the document prior to filing.[245]  As a result, debtors must sign the petition and schedules the old-fashioned way—with pen and paper—creating a so-called "original" or "wet signature."[246]

---

[241]    In re Alvarado, 363 B.R. at 491 (citing In re Wenk, 296 B.R. at 725).

[242]    See Fed. R. Bankr. P. 5005(a)(2)(A); W.PA.LBR 5005-1(a).

[243]    See Fed. R. Bankr. P. 5005(a)(2)(C); W.PA.LBR 5005-6(a); see also W.PA.LBR 5005-2 (Registration as a Filing User).

[244]    See W.PA.LBR 5005-6(b).

[245]    See In re Phillips, 317 B.R. at 523; In re Willis, 604 B.R. at 212; In re Whitehill, 514 B.R. at 691; In re Stomberg, 487 B.R. at 807; In re Josephson, No. 04–60004–13, 2008 WL 113861, at *6 (Bankr. D. Mont. Jan. 9, 2008); In re Alvarado, 363 B.R. at 491; In re Wenk, 296 B.R. at 727.

[246]    One caveat: In response to the COVID-19 pandemic, *Standing Order 20-209* temporarily provided alternative means of satisfying the original, physical signature requirement, including:

   a. Counsel secures and maintains the debtor's original, physical signature before filing the document, as presently required, or

   b. Counsel secures the debtor's digital signature via any commercially available digital signature software and maintains a copy of the digitally signed document in the case file, or

   c. Counsel obtains express written permission (including via text message or electronic mail) from the debtor to affix the debtor's /S/ signature to the document and maintains a copy thereof in the case file, or

To bridge the gap between the bare representation and proof of the "wet signature," the local rules impose two obligations on attorneys. First, Filing Users are required to maintain original signatures in paper form for all electronically-filed documents for six years from the date of case closing.[247] The Court may require counsel to present these documents for review at any time and impose sanctions if they cannot.[248] Second, attorneys must file (by non-electronic means) a *Declaration RE: Electronic Filing of Petition, Schedules, & Statements* ("E-Filing Declaration") with the debtor's original "wet signature."[249] The *E-Filing Declaration* actually consists of two declarations.[250] First, the debtor certifies the accuracy of the information contained in his petition and schedules and expressly authorizes the bankruptcy filing.[251] Second, debtor's counsel declares, among other things, that "the debtor will have signed this form *before* I submit the petition, schedules, statements and mailing matrix."[252]

The critical takeaway is that the timing of the debtor's "wet signature" matters a great deal. By affixing the debtor's electronic signature and filing the petition and schedules, an attorney represents to the Court that the debtor confirmed the accuracy of the document under the penalty of perjury. Unless that has already happened, there is no factual basis for such a representation under Bankruptcy Rule 9011(b)(3). Nor can an attorney truthfully declare that a

---

d. Counsel obtains an image of the specified signature page showing debtor's original signature thereon via email, text message, or facsimile transmission and maintains a copy of the image and its transmission media in the case file.

*Standing Order 20-209* at ¶ 1. While this standing order applied to the Fifth Case, Attorney Willis did not rely on it.

[247]   See W.PA.LBR 5005-15(a).

[248]   See W.PA.LBR 5005-15(b)-(c).

[249]   W.PA.LBR 5005-7(a); see also PAWB Local Form 1A (07/13). An *E-Filing Declaration* is a sealed record because it contains the debtor's social security number.

[250]   PAWB Local Form 1A (07/13).

[251]   Id. at Part I.

[252]   Id. at Part II (emphasis added).

debtor signed the *E-Filing Declaration* before the petition and schedules are filed when they did

not.   And to be crystal clear, a late signature cannot "un-ring the bell" on counsel's false

representations to the Court.[253]

Here, it is undisputed that Attorney Willis obtained, retained, and produced the

Debtor's "wet signatures" in compliance with the local rules.[254]  This factually distinguishes the

present case from *In re Willis* where he electronically filed 42 cases without a "wet signature" from

his clients.[255]  The Court also agrees that the "wet signatures" prove the Debtor consented to the

bankruptcy filings.[256]  Beyond that, Attorney Willis has a timing problem as the following table

demonstrates:

| | Petition Date | Petition Wet Signature Date | Date Schedules/Plan Filed | Schedules/Plan Wet Signature Date | Wet Signature Date on filed *E-Filing Declaration* |
|---|---|---|---|---|---|
| Second Case (2016) | 12/31/2016 | Undated | 2/6/2017 | Undated | **1/3/2017** |
| Third Case (2017) | 12/29/2017 | Undated | 1/21/2018 | Undated | **1/10/2018** |
| Fourth Case (2019) | 3/30/2019 | **4/8/2019** | 3/30/2019 | **4/8/2019** | **4/18/2019** |
| Fifth Case (2020) | 7/31/2020 | **8/14/2020** | 8/22/2020 | 8/14/2020 | **8/17/2020** |

In both the Fourth and Fifth Cases, the Debtor's "wet signature" on the petition

post-dates electronic filing, as does the filing of the schedules and plan in the Fourth Case.

---

[253]    See, e.g., In re Green Rivers Forest, Inc., 190 B.R. 477, 481 (Bankr. M.D. Ga. 1995) (under Bankruptcy Rule 9011, the relevant inquiry is the date the document is signed).

[254]    See W.PALBR 5005-15(a)-(b).

[255]    *In re Willis*, 604 B.R. at 211.

[256]    Technically, an unauthorized bankruptcy petition may be subsequently ratified. See, e.g., In re Pinnacle Land Grp., LLC, No. 17-23339-GLT, 2018 WL 4348051, at *9 (Bankr. W.D. Pa. Sept. 10, 2018).

Attorney Willis offers no explanation.  Consequently, the Court finds that he violated Bankruptcy Rule 9011(b)(3) at least three times by misrepresenting that he had the Debtor's "wet signature" when he did not.

Unfortunately, the table's final column reveals that the misrepresentations did not stop there.  The Debtor's "wet signatures" in the Second and Third Cases are undated[257]—an exceptionally poor practice if they were timely signed.  While reviewing these exhibits to the *Omnibus Response*, the Court came across an undated "wet signature" on an *E-Filing Declaration*. This prompted the Court to check the filed *E-Filing Declarations*, which all date the Debtor's "wet signature" after the petition date for that case.  Taken at face value, Attorney Willis violated Bankruptcy Rule 9011(b)(3) twice more by filing the petitions in the Second and Third Cases without "wet signatures."[258]  Also, his declaration in each case—that the Debtor signed the *E-Filing Declaration* before the petition and schedules were filed—was patently false, constituting another four violations of Bankruptcy Rule 9011(b).

In sum, the Court finds that despite producing "wet signatures" for the Debtor's cases, Attorney Willis made at least nine misrepresentations with respect to them.

## ii.    Filing Knowingly Inaccurate Schedules

In the Debtor's last four cases, Attorney Willis filed nearly identical *Schedules E/F*.

---

[257]    Attorney Willis states that "[a]s a matter of practice, neither he nor anyone in his firm affixes dates on documents where the client has not done so."  *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 39.

[258]    An alternative explanation might be that Attorney Willis irrationally post-dated the Debtor's "wet signature." Assuming he made such a self-defeating mistake, it would be a misrepresentation of when the Debtor executed the *E-Filing Declaration* in violation of Bankruptcy Rule 9011(b)(3).  As recognized in footnote 257, Attorney Willis denies that his office dates signatures when the client has not done so. Id.

Despite having the proofs of claim and a record of distributions from each prior case, he decided

not to attempt a reconciliation.  Instead, as the following table illustrates, Attorney Willis copied

the increasingly understated figures from the Second Case into each new one.

|  | Claims Scheduled | Claims Filed | Difference | Increase from Prior Case |
|---|---|---|---|---|
| Second Case (2016) | $104,786.76 | $104,863.11 | $76.35 | --- |
| Third Case (2017) | $104,791.71 | $114,235.20 | $9,443.49 | $9,367.14 |
| Fourth Case (2019) | $104,791.71 | $121,492.88 | $16,701.17 | $7,257.68 |
| Fifth Case (2020) | $104,791.71 | $130,879.33 | $26,087.62 | $9,386.45 |

In other words, he twice filed knowingly inaccurate schedules rather than perform a reasonable

inquiry into the facts using the best information already in hand.   These are quintessential

violations of Bankruptcy Rule 9011(b)(3).

For his part, Attorney Willis admits his failure to update the claims was "not best

practice" and "sloppy,"[259] but otherwise shrugs off his error in judgment as honest and trivial.  He

asserts that even if *Schedule E/F* had been spot-on, it would not have impacted the direction of the

case or his advice to the Debtor.[260]  This response is concerning, as one would expect a strategic

re-evaluation after steadily losing ground with every case, yet it is emblematic of the "go nowhere"

cycle of the Debtor's filings.  In any event, Attorney Willis completely misses the point.

Under Bankruptcy Rule 9011(b), an attorney has an obligation to perform

objectively reasonable due diligence and not make any representation without evidentiary

---

[259]     *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 40.   Attorney Willis argues that it would have been "difficult to impossible" to calculate the claims, id., but his estimate was only $77 off in the Second Case, proving it can be done when he commits to the task.

[260]     Id.

support.[261]  That extends to the preparation of a debtor's schedules.[262]  But Attorney Willis opted

out, preferring to rely on numbers he subjectively knew were materially wrong.  That was a choice,

not an honest mistake.   And Attorney Willis' casual disregard of a fundamental duty and

indifference towards repeated, intentional misrepresentations to the Court are unacceptable even

without a definite impact to the case.[263]

Lest there be any confusion, the Court is not imposing a standard of absolute

precision for scheduled claims.  To the contrary, all that is required is that the schedules reflect a

good faith, objectively reasonable inquiry into the claims against the debtor.

### iii.     Proposing Patently Unconfirmable Chapter 13 Plans

In the Fourth and Fifth Cases, Attorney Willis filed chapter 13 plans that he

describes as "adequate protection."  Each plan only contemplated a monthly obligation equal to

the Debtor's scheduled monthly net income ($700 and $1,000, respectively) for 60 months without

satisfying the listed secured claims.  Naturally, neither payment actually protected creditors as

evidenced by the $11,000 increase in the tax claims between the Fourth and Fifth Cases.  At best,

these manageable amounts protected the Debtor from triggering a payment default before the final

conciliation.  Regardless, Attorney Willis admits the purpose of these plans was to keep the

Debtor's "options open."[264]

---

[261]    Fed. R. Bankr. P. 9011(b)(3).

[262]    See In re Thomas, 612 B.R. 46, 62 (Bankr. E.D. Pa. 2020) ("attorneys have an independent and affirmative
duty to ensure that a debtor's bankruptcy schedules are current and accurate.").

[263]    Though not implicated by the Debtor's cases, it is worth noting that chapter 13 has a debt limit, see 11 U.S.C.
§ 109(e), so the amount of scheduled debt is not irrelevant.

[264]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case
No. 20-22276-GLT, Dkt. No. 139 at ¶ 70 ("Mr. Willis did not have the plan reflect a change to covering the
complete amount of the plan with payments through increased rent . . . He left those options open . . . .").

As previewed in the first paragraph of this *Memorandum Opinion*, there is no such thing as an adequate protection plan. Once the debtor files a chapter 13 plan, the Code requires the court consider that plan for confirmation.[265] But the court can only confirm a plan if it satisfies section 1325(a).[266] Among other things, this section requires that the plan be proposed in good faith, pay unsecured creditors at least as much as they would receive in chapter 7, provide for allowed secured claims, and be feasible.[267] Otherwise, denial of confirmation is cause for conversion or dismissal.[268] So to state the obvious: *chapter 13 plans must be confirmable*.

Yet Attorney Willis once again opted out of a clear mandate. Given the unencumbered equity in the properties, he knew that neither the chapter 13 trustee nor the taxing authorities would accept anything less than full payment. By the Fourth Case, Attorney Willis also knew that the Debtor lacked sufficient income to fully fund a confirmable plan but would not consent to selling 110 Cherry Street. His solution was to file an unconfirmable plan, kicking the can in hopes that something would change before the issue came to a head. Put simply, Attorney Willis filed a legally unsustainable plan for an improper purpose.[269]

Disingenuously, Attorney Willis tries to lay blame with the local form plan,[270] arguing that it lacked a place to indicate an anticipated change in income.[271] Basically, he asserts that the Debtor's strategy—paying all claims with a future increase in rental income—could not

---

[265]    See 11 U.S.C. §§ 1321, 1324.

[266]    See 11 U.S.C. § 1325(a). This district's interim confirmation orders are not confirmation orders under section 1325(a). In re Roebuck, 618 B.R. at 732.

[267]    See 11 U.S.C. § 1325(a)(3)-(6).

[268]    See 11 U.S.C. § 1307(c)(5).

[269]    See Fed. R. Bankr. P. 9011(b)(1)-(2).

[270]    See PAWB Local Form 10.

[271]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 41.

be memorialized within the confines of the form.  This is just wrong.  The local rules require a chapter 13 plan to substantially conform to Local Form 10.[272]  Whatever the outer limits of "substantial conformity,"[273] debtors certainly have the flexibility to build periodic payment increases into the plan.[274]  In fact, Local Form 10 contains a specific section for "Nonstandard Plan Provisions" to explain atypical measures to complete the plan.  In reality, this is all smokescreen for not wanting to commit the Debtor to increasing his payments earlier than absolutely necessary.

      For these reasons, the Court finds that Attorney Willis violated Bankruptcy Rule 9011(b)(1) and (2) by filing the so-called adequate protection plans in the Fourth and Fifth Cases.

### iv.     Proposing Unfeasible Plan Modifications

      Because the chapter 13 plans Attorney Willis filed in the Fourth and Fifth Cases were patently unconfirmable, modifications were necessary to attain confirmation.  In each case, the Debtor consented to increase his monthly payment obligation to the amount required to pay all claims over the remaining plan term.  The resulting payment obligations were more than three-times the Debtor's scheduled monthly net income, with the shortfall ostensibly to be covered by obtaining market-rate rent for both rental properties.  By that time, Attorney Willis knew or should have known the modified payments were not feasible.  Accordingly, proposing these modifications violated Bankruptcy Rule 9011(b)(3).

      Before delving into the facts supporting these conclusions, the Court will frame its analysis with two threshold issues raised by Attorney Willis: (a) whether he made a representation

---

[272]    See W.PA.LBR 3015-1.

[273]    Id.

[274]    Technically, a debtor can propose different monthly payments over the life of the plan, but a secured creditor can insist on equal monthly payments.  See 11 U.S.C. § 1325(a)(5)(B)(iii)(I).  Since the last four of the Debtor's cases all involved a so-called adequate protection component with the promise of greater payment later, it seems safe to assume that unequal payments would not have been an impediment to confirmation if expressly contemplated by the plan from the beginning.

regarding the feasibility of the modifications; and (b) whether he could reasonably rely on the Debtor's representations.

### a.      Plan Modifications and Bankruptcy Rule 9011

From the get-go, it should be evident that consent to a pre-confirmation modification is the functional equivalent of the debtor filing a chapter 13 plan.  Indeed, only the debtor may file a chapter 13 plan or modify one before confirmation.[275]  And it is always the debtor's burden to prove compliance with section 1325(a).[276]  It does not matter that the modification comes at the insistence of the chapter 13 trustee or creditors because they cannot force the debtor accept it.[277]  At this stage, they can only object to confirmation and seek conversion or dismissal.[278]  Therefore, by consenting to the modification, the debtor adopts it as their own and proposes it to the Court for confirmation.  It necessarily follows that the debtor implicitly, if not explicitly, represents that the modification satisfies the provisions of section 1325(a), including feasibility.

The corollary to these principles is that debtor's counsel is also on the hook for the modification submitted to the Court.  Even when the debtor orally consents to modify the payment obligation at a conciliation conference, counsel implicitly endorses that representation.  This is consonant with the fact that the debtor and counsel arrive having discussed the claims on file and

---

[275]      See 11 U.S.C. §§ 1321, 1323.

[276]      See, e.g., McKinney v. McKinney (In re McKinney), 507 B.R. 534, 539 (Bankr. W.D. Pa. 2014).

[277]      Attorney Willis erroneously states that "there was no alternative but to consent to the increased payments." *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 41.  They may not have been especially palatable to the Debtor, but there were alternatives, including but not limited to, surrendering a property.

[278]      See 11 U.S.C. §§ 1307(c), 1325(b).

settled upon a strategy.[279]   A contrary rule would encourage jiggery-pokery to bypass filing

liability under Bankruptcy Rule 9011.[280]

      Realistically, a plan modification should rarely provoke this level of scrutiny.  That

said, filing an unconfirmable chapter 13 plan that effectively mandates a modification is a bad

omen.  The consistent failure of serial filings might also that signal something is amiss.  Here, it is

particularly compelling that Attorney Willis initiated the Fourth and Fifth Cases knowing the

Debtor intended to fund his plan with increased rent.  It would be irrational to let him silently

disclaim the feasibility of the idea at confirmation.

### b.    Client Reliance under Bankruptcy Rule 9011

      As recognized by the Third Circuit, "lawyers constantly and appropriately rely on

information provided by their clients."[281]  In *In re Taylor*, it explained "the degree to which an

attorney may reasonably rely on representations from [a] client."[282]  Generally, the Third Circuit

held:

> [A] lawyer need not routinely assume the duplicity or gross
> incompetence of [a] client in order to meet the requirements of Rule
> 9011.  It is therefore usually reasonable for a lawyer to rely on
> information provided by a client, especially where that information
> is superficially plausible and the client provides its own records
> which appear to confirm the information.[283]

---

[279]  Any fundamental disagreement between the two should be settled in accordance with the ethical rules.  See Pennsylvania Rules of Professional Conduct 1.2 at cmt. 2, 1.16(b).

[280]  The Court is not convinced that Attorney Willis intentionally sought to avoid signing a chapter 13 plan funded with unrealized market-rate rent.  Certainly, his insistence that the limitations of the local form plan prevented him from filing such a plan is nonsensical and comes across as evasive.  Still, the Court finds it more likely that Attorney Willis merely intended to delay the inevitable with the "adequate protection" plans.

[281]  In re Taylor, 655 F.3d at 284.

[282]  Id.

[283]  Id.

Nevertheless, the Third Circuit observed that "reasonable" reliance carries with it certain assumptions.  First, even when the client supplies information, there must still be an inquiry that is reasonable under the circumstances:

> [R]easonable reliance on a client's representations assumes a reasonable attempt at eliciting them by the attorney. That is, an attorney must, in her independent professional judgment, make a reasonable effort to determine what facts are likely to be relevant to a particular court filing and to seek those facts from the client. She cannot simply settle for the information her client determines in advance . . . that she should be provided with.[284]

The standard also implies that the client is a reasonable source of the necessary information under the circumstances, but not the exclusive source.  In other words, it may not be reasonable to rely on a client for information that an attorney can easily verify independently.[285]  Finally, it is manifestly unreasonable to "ignore[] clear warning signs as to the accuracy" of information regardless of its source.[286]

In the present case, Attorney Willis argues that he reasonably relied on the Debtor's "indications that he could undertake certain actions," such as increasing his rental income.[287]  The Debtor is indisputably a reasonable source of information regarding his own intentions.  The problem, as will be discussed below, is that Attorney Willis failed to appropriately weigh all known facts, including the Debtor's history of performance, in assessing whether the Debtor could feasibly fund a plan in this manner.

---

[284] Id.

[285] See In re Parikh, 508 B.R. 572, 579 (Bankr. E.D.N.Y. 2014) (reliance on client's representations was unreasonable where attorney could have easily discovered the inaccuracies with a basic inquiry); In re Jerrels, 133 B.R. 161, 164 (Bankr. M.D. Fla. 1991) (attorney's blind acceptance of debtor-wife's representation that her husband had signed the petition was unreasonable when the attorney never met with him).

[286] In re Taylor, 655 F.3d at 285

[287] *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 26-27.

### c.    The Plan Modifications were Objectively Not Feasible

As previously stated, the Court finds that Attorney Willis knew or should have known that the modified payments in the Fourth and Fifth Cases were not feasible.  While a similar plan modification in the Third Case was certainly iffy, the attempt was not plainly unreasonable under the circumstances.  Even so, the failure of the Third Case provides more context as the Court considers all facts known to Attorney Willis when those modifications were confirmed.

To start, the Court observes that the Debtor's income has been relatively steady throughout his cases.  Aside from rent, the Debtor's monthly income stems from social security benefits that have increased over time from $772 to $850, plus $750 in "casual income."[288]  The Court also notes that the Debtor is reportedly disabled,[289] suggesting there may be a practical cap on his ability to increase his non-rental income.

The first public indication that the Debtor wanted to fund a chapter 13 plan with rental income came at the meeting of creditors held in January 2018.[290]  Given that Attorney Willis filed a sale plan in the Third Case, the Court will assume he learned of the Debtor's change of heart around the same time.  In hindsight, the Debtor's assertion that a tenant was willing to pay $900 per month should not have instilled much confidence.  With only $700 in monthly net income he was nearly $2,000 short of his target and the net impact of the $900 rent was likely only a few hundred dollars.[291]  Nevertheless, the Court appreciates Attorney Willis' desire to give the Debtor

---

[288]    See *Schedule I: Your Income*, Case No. 16-24838-GLT, Dkt No. 26 at 25-26; *Schedule I: Your Income*, Case No. 17-25165-GLT, Dkt No. 22 at 25-26; *Schedule I: Your Income*, Case No. 19-21309-GLT, Dkt No. 1 at 33-34; *Schedule I: Your Income*, Case No. 20-22276-GLT, Dkt No. 20 at 27-28.

[289]    Id.

[290]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 34.

[291]    See *Schedule I: Your Income*, Case No. 17-25165-GLT, Dkt No. 22 at 25-26 (disclosing $1,000 of monthly rental income); *Schedule J: Your Expenses*, Case No. 17-25165-GLT, Dkt No. 22 at 27-28.

the benefit of the doubt despite the difficulty.[292]   At the time, it was reasonable to believe the Debtor was motivated to prevent the loss of his properties through sale or foreclosure.

When the Third Case was dismissed in March 2019, the Debtor cumulatively paid only $7,000 in 14 months.[293]   Put differently, he failed to pay even his monthly net income of $700 consistently.   And based on the *Schedule I* filed 25 days later, the rental income had not increased beyond the $1,000 reported in the Third Case.[294]   Ironically, the lesson Attorney Willis should have learned from the Third Case is basically the same as the Second Case: the Debtor does not follow through.

Particularly with the quick turnaround, it is unclear why Attorney Willis believed the Fourth Case would be any more successful than the Third Case.   Admittedly, his independent research revealed that market rent for the area was between $1,000 and $1,500 a month in 2019.[295] On paper, that sounds like $2,000 to $3,000 for the two rental properties, providing some evidentiary support for a rent-funded chapter 13 plan.   But Attorney Willis should have been skeptical of the Debtor's ability and willingness to generate top market rent considering that his daughter rented 108 Cherry Street.

Preserving 108 Cherry Street for the Debtor's daughter and her three children has always been a stated goal of his bankruptcy filings.[296]   While the record is practically non-existent, it is telling that the Debtor never extracted any additional rent from her despite the imminent threat

---

[292]   *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 41:23-42:9.

[293]   See *Trustee's Report of Receipts and Disbursements*, Case No. 17-25165-GLT, Dkt. No. 47.

[294]   See *Schedule I: Your Income*, Case No. 19-21309-GLT, Dkt No. 1 at 33-34.

[295]   *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 73; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 46:21-47:6.

[296]   *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 11; *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 27:16-28:7.

of foreclosure.  If $500 is truly well-below market-rate, meaning replacement housing would cost two or three times more, one would think the daughter would pay more if she had the capacity.  To that point, Attorney Willis acknowledges that she lost her job,[297] though it is unclear when or for how long.[298]  And at his deposition, Attorney Willis also testified that he believed there were issues with her paying rent regularly, though he could not recall specifically.[299]  For all these reasons, it was not reasonable to believe the Debtor would or could triple the rent on 108 Cherry Street.

The record is sparse, but similar dynamics may have impeded the Debtor from obtaining market rent for 110 Cherry Street as well.  The tenant, who may or may not have been the same person all along, was at one point the Debtor's nephew.[300]  Further complicating matters, Attorney Willis asserts that the tenant developed a serious illness (maybe cancer) by the Fifth Case.[301]  In terms of the Fourth Case, however, the Court can only say that Attorney Willis was on notice that tripling the rent of 110 Cherry Street was proving difficult.

Critically, the math barely supported the feasibility of a rent-funded plan in the Fourth Case.  By October 2019, a monthly payment obligation of $2,643 was needed to fully fund the plan.  The Debtor's $700 monthly net income resulted in a funding shortfall of $1,943 per month.  Attorney Willis' research suggested this target was achievable because the top end of the market for both rental properties ($3,000) would raise his monthly net income to $2,700.  But

---

[297]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 74-75.

[298]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 85:2-9 (Attorney Willis recalled that the daughter lost her job, but could not recall in which case).

[299]    Id. at 84:1-10.

[300]    Again, even Attorney Willis is unsure.  *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶ 75, n.10.

[301]    *Deposition of Lawrence Willis, Esq.*, Case No. 20-22276-GLT, Dkt. No. 139 at 84:13-19.

unless the Debtor was able to triple his rental income within two months of the proposed modification, even market rent could not fully fund the plan in time.

Given the tightness of the numbers, the unlikelihood that the Debtor would triple his daughter's rent, and the fact that he had not raised rents in 21 months, there was no objectively reasonable basis to believe the proposed modification was feasible.

And it was not. The Fourth Case was dismissed in June 2020 with the Debtor again having paid only $7,000 in 14 months.[302] After two failed attempts at a rent-funded plan, as well as an abandoned sale plan, Attorney Willis had no reason to believe the Debtor would ever complete a plan.

Yet the Fifth Case was filed about two months later. Surprisingly, the Debtor finally increased his rental income . . . *by $200*.[303] This minimal increase after 31-months of "effort" should have unequivocally signaled to Attorney Willis that the Debtor would never obtain market rent for either property. Any lingering doubts should have been settled by the bleak circumstances wrought by the pandemic, including a seriously ill tenant that could not be evicted.[304]

Most egregiously, Attorney Willis failed to realize that his market research no longer supported the viability of a rent-funded plan. By February 2020, the necessary plan modification required a monthly payment of $3,316,[305] $2,316 more than the Debtor's monthly

---

[302]    See *Trustee's Report of Receipts and Disbursements*, Case No. 19-21309-GLT, Dkt. No. 57.

[303]    See *Schedule I: Your Income*, Case No. 20-22276-GLT, Dkt No. 20 at 27-28.

[304]    *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at ¶¶ 74-75. On the other hand, the Debtor was able to extract an additional $200 from the tenant despite his illness and protection from eviction.

[305]    See *Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions*, Case No. 20-22276-GLT, Dkt. No. 52.

net income.[306]  Even assuming the Debtor could triple the rent on both properties—an assumption thoroughly refuted by his performance and the outlined facts—that would yield a net increase of only $1,800.  He would still be short by $516.  Because the Debtor is disabled and his income has not fluctuated significantly, it is doubtful he could cover the shortfall.  In fact, he has struggled to maintain payments of only $700 per month.  Consequently, it should have been obvious that the Debtor could not perform the plan modification to completion.

Ultimately, Attorney Willis knew or should have known that the plan modifications in the Fourth and Fifth Cases were not feasible.  Since there was no objectively reasonable basis to assert the Debtor could complete them, the Court finds Attorney Willis violated Bankruptcy Rule 9011(b)(3) by putting the modifications before the Court.

### v.      Filing Serial Chapter 13 Cases for an Improper Purpose

Attorney Willis insists there was no bad faith purpose to the Debtor's filings.  Instead, he maintains that everything results from a little sloppiness, some honest mistakes, and good faith efforts that fell short.  Yet over and over, everything aligned in a way that not only produced the same underwhelming (and prejudicial) results, but appeared designed specifically for that purpose.  In the end, the Court may infer an improper purpose from the consequences of the filing.[307]  Therefore, the Court finds that the Fourth and Fifth Cases lacked a proper purpose because Attorney Willis had no reasonable expectation that a plan would be completed.

The Court can understand filing the Second and Third Cases.  Following the dismissal of the payment-driven First Case, the Second Case reasonably changed direction towards a sale of 110 Cherry Street.  The sale, supplemented by $700 monthly payments, should have

---

[306]      See *Schedule J: Your Expenses*, Case No. 20-22276-GLT, Dkt No. 20 at 29-30.

[307]      See Crawford Square Community (In re Turner), 326 B.R. 328, 331 (Bankr. W.D. Pa. 2005).

easily satisfied all claims at that time.  Unfortunately, the Second Case did not work because the Debtor failed to retain a broker.  While not encouraging, it was Attorney Willis' first case with the Debtor, and perhaps the first "red flag" in their dealings.  As such, the Court can appreciate giving the Debtor the benefit of the doubt and reasonably believing that he would hire a broker when filing the Third Case.

After the Debtor decided to alter course once more and fund the Third Case through rent maximization, Attorney Willis' support was not unreasonable.  Though it should have been apparent that $900 rent was inadequate, he reasonably relied on the Debtor's representation that a rent increase was imminent and more could follow.  The Court also sees value in letting the Debtor exhaust his alternatives before resigning himself to the sale of 110 Cherry Street, which still seemed a viable back-up plan.  Nevertheless, the Debtor did not increase the rent in 14-months (not even the promised net-$900), pay his monthly net income, or switch gears to sell 110 Cherry Street.  These are lessons that Attorney Willis should have carried forward, but he instead opted for a bankruptcy version of *Groundhog Day*, aimlessly reliving the same case over and over.

In comparison, the Fourth Case was objectively unreasonable.  Filed less than two months after the Third Case, its only purpose was to prevent a sheriff's sale of the properties.  The circumstances had not changed and there was no reason to believe another case would fare any better.  To the contrary, the Debtor's performance in the Second and Third Cases should have raised numerous red flags about his reliability or willingness to proceed.  And, as explained above, Attorney Willis' market research barely supported the feasibility of a rent-funded plan before factoring in the need to obtain premium rent from the Debtor's daughter and tenant.[308]

---

[308]     See Section IV.A.2.iv.c, *supra*.

If filing the Fourth Case was unreasonable, the Fifth Case was colloquially insane.[309]  It repeated a flawed strategy that failed twice before but was now hampered by the economic fallout of the ongoing COVID-19 pandemic.  In fact, the timing of the Fifth Case is baffling since the Debtor neither had sufficiently increased his income nor faced imminent foreclosure thanks to the temporary moratorium.  In essence, the filing had no obvious purpose or benefit except that it permitted Attorney Willis to collect another fee.

Frankly, it is doubtful that Attorney Willis relied on the Debtor after the Third Case or even gave the filings much thought.  His conduct hints towards purely going through the motions as appeasement, expecting the Debtor to sink or swim on his own.  Consider the "adequate protection" plans filed: despite offering less than a third of past reconciled payments, these directionless non-plans successfully triggered a confirmation track while deferring any real commitment for about seven months.  This self-defeating strategy did not so much buy the Debtor time as borrow it from a hard-money lender.  With artificially low payments that were outpaced by the accruing claims, the eventual reckoning would demand an even greater monthly obligation with less time to pay.  Essentially, the Debtor was in default on day one of each case and growing an insurmountable arrearage.

Meanwhile, Attorney Willis was satisfied with the abstraction that "a plan" could be completed if the properties' objective value was captured through a sale or market rent.  This unreasonable focus on what "could" happen in a vacuum willfully blinded him to what was actually happening and, consequently, the likely outcomes.  It took the Debtor two years to increase his rental income by a meager $200—a far cry from the $2,000+ that was needed to fund a plan.

---

[309]    "Allegedly, Albert Einstein said that the definition of insanity is doing the same thing over and over again and expecting a different result."  Wallace v. Colvin, 193 F. Supp. 3d 939, 941 (N.D. Ill. 2016).

Whether it was due to familial or market stresses, laziness, or just bad luck, it was apparent by the Fourth Case that the Debtor would not succeed in this endeavor.[310]  It was just as clear by that time that he was not willing to sell 110 Cherry Street.  It is also inconceivable that they discussed a sale dozens of times and every time Attorney Willis believed the Debtor would do something he never did.  In any event, a chapter 13 petition cannot be justified by a plan that is neither filed nor seriously pursued.[311]  It is also worth noting that the sale of 110 Cherry Street shepherded by successor counsel did not satisfy the claims that accrued during these cases.

As a last-ditch effort, Attorney Willis vainly tries to shift the blame for these serial filings to the very creditors prejudiced by them.  He emphasizes that they never sought a bar order, nor pressed an objection to confirmation.  As such, Attorney Willis posits that his duty of undivided loyalty to the Debtor precludes any obligation to act on behalf of disengaged creditors, including as to feasibility.  But he mischaracterizes the issue: Attorney Willis had a duty not to file a case without a proper purpose.  Since it was not reasonable to believe the Debtor would complete a confirmable chapter 13 plan, there was no proper purpose to the Fourth and Fifth Cases.

For all these reasons, the Court finds that Attorney Willis violated Bankruptcy Rule 9011(b)(1) by filing the Fourth and Fifth Cases.

---

[310]    Some passages of the *Omnibus Response* confirm that Attorney Willis lacked faith in Debtor's ability to complete a rent-funded plan.  See *Omnibus Response to Investigation Report and Court's Order Regarding Attorney Lawrence Willis*, Case No. 20-22276-GLT, Dkt. No. 139 at 41 ("The third and fourth plans did not mention the sale of the house because of Mr. Kelly's stated desire to raise the rent. . . .  However, Mr. Willis still believed that ultimately to successfully complete a plan, the sale was going to be necessary to successfully complete the plan.").

[311]    Attorney Willis's reliance on a hypothetical sale, as opposed to Attorney Valencik's actual pursuit of one, is but one reason why there is no equivalence in the reasonableness of their conduct.

### 3.    Sanctions under Bankruptcy Rule 9011

Once the Court determines that an attorney or a party has violated Bankruptcy Rule 9011, it may impose an appropriate sanction.[312]  The sanction must be limited to "the *minimum* that will serve to adequately deter the undesirable behavior,"[313] and may consist of a monetary penalty payable to the Court or "directives of a non-monetary nature."[314]  Further, although Bankruptcy Rule 9011 imposes a standard of objective reasonableness, subjective intent is relevant to the determination of the appropriate sanction.[315]  For "[e]ven a dog, said Holmes, distinguishes between being kicked and being stumbled over."[316]

As outlined above, the Court finds that Attorney Willis violated Bankruptcy Rule 9011(b) in connection with the Debtor's cases 17 times.[317]  Several arose from repeating the same mistakes in multiple cases, while other violative conduct naturally led to further distinct violations. Ultimately, regardless of how the violations are quantified, Attorney Willis engaged in widespread misconduct.

---

[312]    Fed. R. Bankr. P. 9011(c).

[313]    See Doering v. Union Cnty. Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988) (quoting Eastway Const. Corp. v. City of New York, 637 F. Supp. 558, 565 (E.D.N.Y. 1986), order modified and remanded, 821 F.2d 121 (2d Cir. 1987)) (internal quotation marks omitted, emphasis in original).

[314]    Fed. R. Bankr. P. 9011(c)(2); see Doering v. Union Cnty. Bd. of Chosen Freeholders, 857 F.2d at 194 ("District courts should, therefore, consider a wide range of alternative possible sanctions for violations of the rule."); Express Am., Inc. v. Tamko Asphalt Products, Inc. (In re Express Am., Inc.), 132 B.R. 542, 545 (Bankr. W.D. Pa. 1991) ("The rule avoids placing explicit limitations on the kinds of sanctions that may be imposed."); Walsh v. Gillin (In re Gillin), No. 85-01393, 1990 WL 146390, at *7 (Bankr. W.D. Pa. Oct. 1, 1990) ("The Court has discretion to tailor sanctions to the particular facts of the case.")

[315]    See Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986); Marker v. Marker (In re Marker), 133 B.R. 340, 348 (Bankr. W.D. Pa. 1991).

[316]    Ameriquest Mortg. Co. v. Nosek (In re Nosek), 609 F.3d 6, 10 (1st Cir. 2010) (quoting O.W. Holmes, *The Common Law* 3 (1881)) (internal citations omitted).

[317]    See Section IV.A.2, *supra*.

While, as previously stated, Bankruptcy Rule 9011 does not permit a "pure heart" to excuse an "empty head,"[318] it may be a mitigating consideration here. Attorney Willis' actions were intentional, yet the Court is unconvinced that he understood the gravity of his choices or that they were objectively unreasonable. The tenor of the *Omnibus Response* betrays narrow thinking and fundamental misapprehensions about bankruptcy law despite his substantial experience. In fact, it seems Attorney Willis' experience with chapter 13 fueled his perception that certain manipulative practices were acceptable and common place. In this sense, the Court and the chapter 13 trustee share a degree of blame. That said, stealing merchandise does not become acceptable simply because the manager, cashier, and security guard are all looking away. Nor can the thief object when he is subsequently identified by the police and arrested. For present purposes, it is enough to say that Attorney Willis did not have fraudulent intent or a culpable mindset as his actions might otherwise suggest.

The Court must also weigh other mitigating factors in crafting an appropriate sanction. For example, Attorney Willis was cooperative and attempted to reach a consensual resolution with the Trustee. Also, his (misguided) defense was strenuous without being defiant. And although the Court finds that Attorney Willis was slow to appreciate the Court's concerns, he acknowledged shortcomings and expressed regret over his conduct. Finally, his offer of a financial settlement was significant.

In aggravation, however, the Court notes that Attorney Willis' handling of "wet signatures" following Judge Deller's decision in *In re Willis* is deeply concerning.

Admittedly, the Court agreed to limit monetary sanctions to the $8,000 outlined in the *Stipulation*. The Court recognizes, however, that Attorney Willis has already suffered financial

---

[318]    See In re Taylor, 655 F.3d at 284.

consequences by retaining counsel to represent him in these matters.  Since the Debtor is hardly blameless and should not be unjustly enriched, the Court finds it fair to consider the total financial impact to Attorney Willis.

Given the totality of the record, the Court finds that the following will serve as an appropriate sanction under the circumstances:

1.  The Court will publish this *Memorandum Opinion* as a public censure of Attorney Willis.  As an inherent consequence of publishing, the *Memorandum Opinion* will also serve as a record of past misconduct to be considered should he fail to learn from his mistakes.

2.  The Court will impose monetary sanctions in the amount of **$8,000** payable to the chapter 7 trustee within 30 days, consisting of the following:

    a.  Two $250 sanctions ($500 total) on account of the petitions in the Fourth and Fifth Cases having "wet signatures" that post-date electronic filing.[319]

    b.  Disgorgement of fees in the amount $5,500 received in connection with the Fifth Case.

    c.  Disgorgement of fees in the amount of $2,000 received in connection with the Fourth Case.

3.  Upon consideration of the proposed "commitments" embodied within the *Stipulation*, the Court will require Attorney Willis to comply with the following directives failing which the Court will not hesitate to impose progressively greater sanctions:

    a.  Attorney Willis shall ensure appropriate homeowners' insurance coverage is in place prior to filing a bankruptcy petition.[320]

    b.  Attorney Willis shall obtain a debtor's original, physical signature on any document that is signed by the debtor before the document is filed with the Court and ensure that they are appropriately dated

---

[319]   The Court will defer sanctions based on the *E-Filing Declarations* signed post-petition.

[320]   The *Stipulation* proposed that Attorney Willis commit to "ensuring homeowners insurance coverage is in place or disclose the lack of coverage to all parties in interest."  *Settlement Stipulation by and Between Attorney Willis, United States Trustee, and Chapter 13 Trustee*, Case No. 20-22276-GLT, Dkt. No. 170-1 at 4.  The Court observes that there is no reason to file a case without proper insurance because lack of insurance is cause for dismissal.

by the debtor.[321]   Any further missteps will trigger exponentially greater sanctions.[322]

c.  Attorney Willis shall ensure his debtor-clients are fully informed of their duties, roles, and obligations with respect to any sale process, including, but not limited to, the need to move forward as expeditiously as is compatible with the best interests of the estate. To facilitate this process, he may provide written information to debtor-clients on obtaining a broker and listing the property for sale.

d.  Attorney Willis shall perform a reasonable inquiry into amounts owed to creditors and ensure that the debtor submits accurate schedules.  For the removal of any doubt, such an inquiry requires reasonable efforts to reconcile any proofs of claim filed in a prior case.

e.  Prior to filing a chapter 13 petition, Attorney Willis shall perform a reasonable inquiry into whether a debtor will be able to submit a feasible plan that can be performed until completion.

f.  Prior to filing any chapter 13 plan, Attorney Willis shall perform a reasonable inquiry into whether the debtor will be able to feasibly complete the plan filed.

g.  Attorney Willis shall not file a so-called "adequate protection" plan or any other patently unconfirmable plan in a chapter 13 case.

h.  Attorney Willis shall familiarize himself with any prior cases filed by the debtor and shall be held accountable for learning critical information from those proceedings.

i.  Absent extraordinary circumstances, Attorney Willis shall not seek extensions of time to file schedules and a plan in a serial case filed within one year of the prior case given that the schedules and plan presumably require only modest updates.

j.  Notwithstanding the "no-look" fee, Attorney Willis shall not bill the same amount of time to update a debtor's schedules and plan from a prior case as would be required to complete them for the first time.

---

[321]   The obligation to obtain a physical signature can be satisfied through compliance with *Standing Order 20-209* so long as it remains in effect.

[322]   The Court notes that $250 per incident is 2.5 times the $100 sanction imposed by Judge Deller.  It would be reasonable to assume a similar multiplier in the future.

All chapter 13 lawyers in this district would do well to incorporate these principles into their own practices.

B.     Excessive Compensation under Section 330

Although Attorney Willis must partially disgorge his fees as a sanction under Bankruptcy Rule 9011, the Court will nonetheless offer a few observations about their reasonableness.  This is necessary because he disputes that he was grossly overcompensated for the value of his services in these cases.  The Court, on the other hand, does not find this a close call.

To start, section 330(a)(4)(B) authorizes the court to allow reasonable compensation to the debtor's counsel for representing the interests of the debtor in connection with the bankruptcy case.[323]  The standard of reasonableness is based on "the benefit and necessity of such service to the debtor," not the chapter 13 estate or creditors.[324]  Courts typically employ a lodestar analysis as guidance for calculating legal fees,[325] determining a reasonable fee based on the number of hours reasonably expended and the prevailing market rates.[326]  By local rule, however, the Court has established "no look attorney fee" of $4,000[327] as a presumptively reasonable fee for the minimum services required in chapter 13 cases.[328]  Assuming counsel

---

[323]     11 U.S.C. § 330(a)(4)(B).

[324]     Id.; see In re Younger, 360 B.R. 89, 94 (Bankr. W.D. Pa. 2006)

[325]     See In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 855-56 (3d Cir. 1994)

[326]     In re Younger, 360 B.R. at 96.

[327]     This amount increased to $5,000 in 2021.  See W.PA.LBR 2016-1(f).

[328]     See W.PA.LBR 2016-1(f).

represents the debtor in accordance with the standards set forth in the local rule,[329] counsel need

not file a fee application if the requested compensation does not exceed that amount.[330]

In connection with the Debtor's cases, Attorney Willis received the following

compensation:

| | |
|---|---|
| Second Case (2016) | $4,000 |
| Third Case (2017) | $4,000 |
| Fourth Case (2019) | $4,000 |
| Fifth Case (2020) | $4,000 |
| | $1,500 |
| | **$17,500** |

The additional $1,500 received post-dismissal of the Fifth Case is immediately suspect because it

was neither disclosed as required by Bankruptcy Rule 2016(b) nor subject to an allowed fee

application. It is also difficult to envision how that amount could have been earned given that

Attorney Willis filed a single two-paragraph pleading before Attorney Valencik appeared.

Attorney Willis primarily relies on the "no-look" fee provisions, but the Court

concludes that he is not entitled to a presumption of reasonableness in the Third, Fourth, and Fifth

Cases. Under the local rule, counsel must "advise and represent the debtor(s) in a manner

consistent with applicable professional standards and be required to perform all matters necessary

to properly and timely complete the bankruptcy case." The minimum services required expressly

include:

> (2) *accurate* and complete schedules, statements of financial affairs,
> and related documents will be prepared by counsel;

---

[329]   See W.PA.LBR 2016-1(g); see also In re Willis, 604 B.R. at 214 ("The "no look" allowance is therefore a
mere rebuttable presumption as to the amount of fees and expenses which are deemed reasonable for counsel
in a Chapter 13 bankruptcy, assuming counsel performs the required functions and services.").

[330]   See W.PA.LBR 2016-1(a).

* * *

> (4) counsel will file a Chapter 13 plan that meets with the requirements of Local Bankruptcy Form 10 (Chapter 13 Plan) and is *capable of confirmation* . . .[331]

Attorney Willis concedes that the *Schedule E/F* filed in all four cases were basically identical and, therefore, did not accurately reflect the claims after the Second Case.[332]   Additionally, the "adequate protection" plans he filed in the Fourth and Fifth Cases were patently unconfirmable.[333]   Therefore, Attorney Willis' representation of the Debtor did not comport with the minimum standards under the local rule.

Ready for this possibility, Attorney Willis points to his time records to support the assertion that he provided services well in excess of the fees received.   Unfortunately, no matter how much time Attorney Willis spent, he would be hard pressed to explain how all of his services were beneficial or necessary to the Debtor.   In fact, such an argument is notably absent from the *Omnibus Response*.

To cut to it: the Fourth and Fifth Cases were not beneficial to the Debtor.   The only potential benefit of either filing was the stay of the sheriff's sale in the Fourth Case, but the Debtor paid a high price for delaying the inevitable.   Beyond the filing fees and Attorney Willis' "no-look" fees, the Debtor fell deeper in debt with each petition.[334]   As a result, the eventual sale of 110 Cherry Street did not satisfy all claims and the Debtor's remaining properties are now in jeopardy.[335]   Arguably, he is worse off today than he was after the Third Case.

---

[331]   W.PA.LBR 2016-1(g)(2), (4) (emphasis added).

[332]   <u>See</u> Section IV.A.2.ii, *supra*.

[333]   <u>See</u> Section IV.A.2.iii, *supra*.

[334]   <u>See</u> Section IV.A.2.ii, *supra*.

[335]   To be clear, Attorney Willis deserves no credit for the sale brought about by Attorney Valencik's efforts even if it occurred in the Fifth Case.

The Court could go on, particularly considering the problems with *Schedule E/F* and the "adequate protection" plans, but a deeper dive would only belabor the point. It suffices to say that even the "no-look" fees were unreasonable under the circumstances.

C.    Systemic Concerns and Preventing Future Abuse

In hindsight, none of the Debtor's payment-driven plans filed by Attorney Willis should have been confirmed.[336] The fact that they were—consistently and without opposition—evidences systemic concerns beyond Attorney Willis' misconduct. The inescapable conclusion is that blind spots in the chapter 13 conciliation process enabled the Debtor's repeated manipulations. Equally clear is that the Court's review of chapter 13 plans has been inadequate to root out abuse. The upshot of this uncomfortable spotlight is that the Court can now eliminate the misconceptions contributing to these problems.

The revolving door of the Debtor's serial filings was assuredly abusive and a concern. Even so, it seems more a symptom occasioned by Attorney Willis' success prolonging the inevitable in chapter 13 than a strategy itself. Had he faced firmer headwinds on feasibility earlier, it might have discouraged futile repetition or forced a reckoning. In particular, the "adequate protection" plans seemingly flummoxed the conciliation process by preying upon the assumption that plans are submitted in good faith with an eye towards confirmation. Effectively, the chapter 13 trustee was tricked into treating these plans as miscalculated when they were actually a means to put off confirmable obligations in bad faith. This tactic allowed the Debtor to remain in chapter 13 much longer than his efforts should have warranted.[337]

---

[336]    Although the Court is satisfied that Attorney Willis had a good faith basis to propose the plan modification in the Third Case, it was still patently unfeasible at the time it was confirmed.

[337]    Looking back, the Debtor's refusal to increase his plan payment at the meeting of creditors should have raised alarms both as to his good faith at that time and the feasibility of doing so at the final conciliation.

Perhaps the biggest vulnerability exposed by Attorney Willis is the misperception that feasibility can be settled through trial and error.  Legally, the Court cannot confirm a chapter 13 plan unless it finds that it is more likely than not that the debtor will be able to complete it.[338] The Court has an independent obligation to ensure this requirement is satisfied even if no creditor or party in interest objects.[339]  And it is always the debtor's burden to convince the Court.[340]

Most debtors ought to be able to demonstrate feasibility simply by reference to their current monthly income and expenses on *Schedules I* and *J*.  Though a debtor's income and expenses often fluctuate over the life of the plan, these schedules function as a rough budget for chapter 13 debtors.[341]  Thus, a proposed plan payment should be logically related to the monthly net income on *Schedule J*, or at least be achievable through plausible expense trimming or income enhancement.

Alternatively, debtors can establish feasibility through performance because "money talks."  But, to avoid the blind spots identified by the Debtor's cases, proof through performance must be subject to certain caveats.  First, only payment of the proposed monthly obligation corroborates a debtor's capacity to do so consistently.[342]  After all, paying $500 monthly does not prove the feasibility of a $2,000 payment.  Next, it goes without saying that confirmation

---

[338]    11 U.S.C. § 1325(a)(6).

[339]    United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 277, 130 S. Ct. 1367, 1381, 176 L. Ed. 2d 158 (2010).

[340]    See In re McKinney, 507 B.R. at 539.

[341]    The Court has frequently emphasized a chapter 13 debtor's continuing duty to disclose material changes in his or her financial situation. See In re Reppert, 643 B.R. 828, 843 (Bankr. W.D. Pa. 2022); Zvoch v. Winnecour (In re Zvoch), 618 B.R. 734, 739 (Bankr. W.D. Pa. 2020).  As recognized in *In re Zvoch*, "chapter 13 debtors have an innate sense of materiality [for] income reductions . . . [that] should applied to the upswings" as well.  618 B.R. at 739 n.38.

[342]    The Court is mindful that the Debtor's artificially low "adequate protection" payment permitted him to develop a good payment history prior to the conciliation conference.  In reality, he was always in default based on the actual plan obligation.

should not be unreasonably delayed to wait and see if an "aggressive" plan proposal works.[343] Finally, a debtor reliably paying an amount unsupported by the schedules raises questions about the accuracy of those schedules.

If feasibility cannot be shown through either of these methods, then the debtor must come forward with something compelling to carry the day.[344]

Make no mistake, the Court is sensitive to the chapter 13 trustee's administrative burden and, honestly, shares her reluctance to hold more contested confirmation hearings. But, as the Court has explained, most cases should not require a hearing to prove feasibility. Ultimately, the Court is stuck with the fact that the Code does not allow everyone to just "try out" chapter 13. And rightfully so, as these cases disprove the conventional wisdom that creditors are better off with some payments through chapter 13 than not. In any event, it is not helpful for plans of doubtful feasibility to be recommended for confirmation.[345]

## V.    CONCLUSION

In light of the foregoing, the Court will enter an order imposing sanctions against Attorney Willis in accordance with section IV.A.3 of this *Memorandum Opinion*. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

_____
Dated: March 31, 2023            GREGORY L. TADDONIO
                                 CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Debtor

_____

[343]    In most cases, a record of feasibility should be demonstrable by the conciliation conference.

[344]    As noted above, see section IV.A.2.iii, a debtor may use the "Nonstandard Plan Provisions" to plead their case for feasibility if it is not apparent from the schedules or performance to date.

[345]    Of course, the chapter 13 trustee is entitled to exercise her discretion to recommend plans for confirmation as she sees fit.